252

Adley Express Company, Inc., Appellant, *v.* Willard.

Argued November 14, 1952. Before STERN, C. J., STEARNE, JONES, CHIDSEY and MUSMANNO, JJ.

*Reuben E. Cohen,* with him *Cohen & Cohen,* for appellant.

*Thomas E. Comber, Jr.,* with him *William R. Klaus* and *Pepper, Bodine, Stokes & Hamilton,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, January 5, 1953:
The plaintiff, Adley Express Company, Inc., brought this action of trespass against Henry Willard and The Salvation Army to recover for damage done to plaintiff's tractor-trailer operated by Harold Williams, when it and a truck belonging to The Salvation Army and driven by Willard, collided. Before the trial commenced, on plaintiff's motion, a voluntary nonsuit was entered as to The Salvation Army because of it being an eleemosynary institution. The case then proceeded to trial against the individual defendant, Willard, and a jury returned a verdict in his favor. Plaintiff's motion for new trial was refused and this appeal is from the judgment entered on the verdict.

The appeal is directed solely at the trial judge's charge to the jury which is claimed to have been erroneous in (1) unduly emphasizing the defendant's version of the accident; (2) misapplying the law to the facts. While more reference was made by the trial judge to the defendant's account of the accident than to that of the plaintiff, the charge was not so unbalanced in this regard as to constitute error. However, the appellant's second contention must be upheld and a new trial awarded. The accident happened at about 8 a.m. on March 10, 1948 on that portion of U. S. Route No. 1 leading from New York to Washington, D. C. known, as it passes through Philadelphia, as Roosevelt Boulevard. It was daylight. The roadway was wet, but this condition played no part in the accident. The two vehicles collided on or near the north end of a bridge on the boulevard known as Pennypack Bridge. On this bridge and to the north and south of it the boulevard consists of four parallel lanes, two for south-bound and

two for north-bound traffic. Each pair of lanes is 22
feet in width. North of the bridge the south-bound
and north-bound lanes are separated by a grass plot
20 feet in width. At the south end of this grass plot
there is a monument and some bushes and trees which
somewhat obstruct from view oncoming vehicles on
the one set of lanes from motorists on the other. The
distance between the north end of the bridge and the
near or south end of the grass plot divider was not
given exactly, but it appears from the testimony to have
been about 50 feet, and here the north lanes and south
lanes converge so as to become contiguous. They do
not merge and the two north-bound and two south-
bound lanes continue over the bridge of the same re-
spective over-all widths. The converging of the two
sets of travelled lanes is gradual and does not prevent
vehicle drivers from having a clear unlimited view
ahead of the lanes on which they are travelling. There
is no crossroad between the grass plot divider and the
bridge. There is a slight down-grade on the south-
bound lanes as they approach the bridge.

The only witnesses who testified as to the happen-
ing were Williams, the driver of plaintiff's truck, and
the defendant driver and helper on The Salvation Army
truck. Williams, who was driving southward with the
plaintiff's tractor-trailer with a 28,000 pound load, tes-
tified that after passing a very slow-moving heavily
loaded truck he was on the left or inner south-bound
lane as he neared the end of the grass plot divider, and
was travelling between 25 and 30 miles per hour; that
he first saw the defendant's truck when it was 25
feet from him, having come from behind the monu-
ment and bushes, travelling westward at right angles
to the south-bound lanes; that he tried to stop and
turned toward the left but because of another vehicle
travelling northward had to turn back and then struck

the right rear of the defendant's truck; that he did not sooner see the defendant's truck because of the monument and shrubbery; that after the accident he asked the defendant to sign a card supplied by his employer, after stating thereon "what happened". At the trial defendant admitted signing this card after writing on it "I was making a 'U' turn off Pennypack Bridge.".

The version of the defendant Willard who was driving a one and one-half ton truck, was that he was proceeding northward and when on the Pennypack Bridge decided to turn back and made a U-turn on the bridge; that he stopped as he entered on the south-bound lanes to look for south-bound traffic which was obstructed from his view by the monument on the grass plot; that seeing no approaching vehicles he completed his U-turn and had travelled about 150 feet on the west or outer south-bound lane when the left rear of his truck was struck by the plaintiff's tractor-trailer. The defendant's helper testified that their truck was struck after it had proceeded southward 50 feet from the grass plot and 50 feet on the bridge or a total of 100 feet, and that the U-turn was made not on the bridge but "right at the monument".

It will be observed from the accounts of both drivers of the two vehicles involved that the monument, bushes and trees at the end of the grass plot divider obstructed from view vehicles proceeding *in the opposite direction.* In his charge the trial judge assumed that these objects prevented the driver of plaintiff's truck not only from seeing vehicles on the opposite or north-bound lanes but from seeing ahead of him on the south-bound lanes. He therefore imposed a higher degree of care upon the driver of the plaintiff's truck than was justified under the circumstances. A fair reading of the latter's testimony which was directed toward his vision of approaching traffic on the north-bound lanes on

which the defendant was travelling before making the U-turn, does not support the conclusion that plaintiff's driver could not see ahead on his lane of travel.

With this misconception, the trial judge charged the jury: "Mr. Williams stated this shrubbery and bushes together with the abutment or monument, obstructed his full view of his approach to the bridge. He said there was an area of fifty feet between an imaginary line, which would be the north end of the bridge to the curb of the grass plot. It is an ordinary rule of common sense that motorists ordinarily exercise due care. It is also their duty to use higher care, and, if necessary, to stop their vehicle if their vision is obstructed while they are driving. If a motorist cannot see what is coming in the opposite direction, or see what is ahead of him, he must stop. If he persists on proceeding, he takes his chance and he cannot complain.".

Earlier in his charge, apparently under the misapprehension that the north and south lanes of the boulevard merged into a single lane when the boulevard crossed the bridge, the trial judge said to the jury: "I think by this time you have a fair picture of the scene of this accident. Pennypack Bridge has been described as generally running north and south. Most of you, I believe, are familiar with the lanes of traffic on Roosevelt Boulevard. There are lanes going south and lanes going north. As traffic approaches this bridge, these lanes merge into the main roadway of the bridge itself. Anyone who has driven an automobile has approached bridges time and time again. They have driven on merging lanes when one road goes into another. That fact alone should make a motorist realize he has to use more care as he approaches a single lane, particularly when he leaves a double highway with double lanes. He is getting into a narrow space. Traf-

fic is converging and it is also coming in the opposite direction. Therefore, he must realize that he has to operate his motor vehicle with greater care.".

Thus again a higher duty of care than was justified was imposed upon the driver of plaintiff's truck. Under all the testimony the latter was chargeable only with the failure to exercise the ordinary care required of all motorists. Nothing in the remainder of the charge cured the misleading effect of these portions of the charge.

When plaintiff's counsel specifically excepted to the court's charge as to the degree of care required of the plaintiff's driver, the court replied, "Anyone driving a car must drive it in such a manner that he can bring it almost to a stop immediately at the first sign of danger. . . .". This statement of the law without amplification or qualification was inaccurate, and the statement again discloses the court's misapprehension of the factual situation presented. The driver of plaintiff's vehicle who had an unobstructed view ahead on his travelled course was not required to observe traffic on the north-bound lanes of this through four-lane highway or to anticipate that a north-bound motorist would make a U-turn into his path at a point where there was no crossroad. Nor was he required to stop or slow down in approaching the bridge under the circumstances here presented since the boulevard continued over the bridge as a four-lane highway. The plaintiff driver was familiar with the road, testifying that he travelled it three times a week and knew there was no intersection there. On a through-traffic four-lane highway there is not imposed upon a motorist the care required in travelling upon an ordinary two-way road with intersecting streets. To hold otherwise would thwart the purpose of through highways to facilitate traffic. Cf. *McCormick Transportation Co. v. Phila-*

*delphia Transportation Co.,* 161 Pa. Superior Ct. 533, 539, 55 A. 2d 771.

If the court had in mind the rule prescribed by statute that a motorist must have his car under such control as to stop "within the assured distance ahead", this rule was not applicable. There was no sign of danger which was reasonably likely to arise under the circumstances here. While it is the duty of the driver of a motor vehicle at all times to have his car under control, ". . . having one's car under control means having it under such control that it can be stopped before doing injury . . . in any situation *that is reasonably likely to arise under the circumstances."*: *Galliano v. East Penn Electric Co.,* 303 Pa. 498, 154 A. 805. (Emphasis supplied). See also *Reidinger v. Lewis Jones, Inc., et al.,* 353 Pa. 298, 45 A. 2d 3; *Craig v. Gottlieb et ux.,* 161 Pa. Superior Ct. 526, 55 A. 2d 573. "The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm . . ., resulting from his act: . . .": *Dahlstrom v. Shrum,* 368 Pa. 423, 425, 84 A. 2d 289. We there approved the following language of Cardozo, C. J. in *Palsgraf v. Long Island R. Co.,* 248 N. Y. 339, 162 N. E. 99: ". . . the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty.".

The court in the instant case charged the jury as to the law applicable to a situation not supported by the facts and the plaintiff was unjustly prejudiced thereby. Cf. *Matthews v. Derencin et al.,* 360 Pa. 349, 62 A. 2d 6.

The judgment is reversed and a new trial awarded.