Yoffee, Appellant, *v.* Pennsylvania Power & Light Company.

Argued May 22, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Arthur Berman*, with him *Samuel Handler* and *Compton, Handler & Berman*, for appellant.

*Macey E. Klein*, with him *Arthur H. Hull, Solomon Hurwitz, James K. Thomas, Hull, Leiby & Metzger* and *Hurwitz, Klein, Meyers & Benjamin*, for appellee.

522

OPINION BY MR. JUSTICE MUSMANNO, June 25, 1956:

The Susquehanna River is about 400 miles long and generally flows south and southeastwardly through Pennsylvania on its way to Chesapeake Bay. It is a picturesque stream which winds and curves with varying widths, sometimes attaining a maximum expansion of two miles. About one mile south of Millersburg, Pennsylvania, it is a half-mile wide and passes between two high hills collectively known as Berry Mountain. The broad passage between these hills is named the Berry Mountain Gap.

The Pennsylvania Power & Light Company, which manufactures, sells, and distributes electric current in this area, has utilized the elevations on either side of the river for the construction of steel towers, from which suspends an electrical transmission line carrying current from the eastern side of the river (Dauphin County) to the western side (Perry County). The towers, which are 40 feet high, are constructed of I-Beams and are planted, respectively, atop the eastern hill which is 680 feet high, and on the western hill which is 657 feet high. The line, formed of three copper cables, measures 5,515 feet in length. Since the air distance between the two towers is only 5,366 feet, an inevitable sag brings the line to a low point of 125 feet above the river level.

On the afternoon of May 11, 1950, a clear day with visibility unlimited, Morris B. Levitz, a licensed aviator, aloft in a single engine Piper Cub plane, was piloting his craft southwardly through the Berry Mountain Gap when it struck the Pennsylvania Power and Light transmission line at a point 185 feet above the river.*

---

* The lower Court speaks of the collision as having occurred at the 125-foot level. No one testified that the mark of impact was at this level, although there was testimony that it occurred at the

The plane somersaulted into the water and Levitz sustained grave injuries from which he died three days later. The administrator of his estate brought an action in trespass against the Pennsylvania Power & Light Company, but at the ensuing trial the Court of Common Pleas of Dauphin County entered a nonsuit, asserting that the plaintiff failed to prove the defendant negligent and that the evidence showed the decedent to have been guilty of contributory negligence. The action of the learned Court below cannot be sustained. Its reasoning adhered close to the ground of terrestial rights but somewhat slighted the now established prerogatives of those who utilize the earth's upper strata in aerial travel.

Up until the advent of the airplane, it was said that the rights of every property owner extended, coterminously with the boundaries of his land, as high as the heavens. Legislation and court decisions during the last 50 years, however, while still guarantying to every property owner the fullest heavenly enjoyment of his property, have taken away a part of the sky which he never could use anyway. Section 3 of the Civil Aeronautics Act of 1938, 49 U.S.C.A. §403, declares: "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States." Navigable air space is defined as "air space above the minimum altitudes of flight pre-

---

"low point." One witness who saw the actual impact testified that the collision occurred approximately 400 yards from the Perry County Shore line. A plan in evidence showed that at that point the wire hangs at a 185-foot level. Since, in reviewing a record, the evidence, where a nonsuit is involved, must be read in the light most favorable to the plaintiff, the 185-foot level, for the purpose of considering the motion to remove the nonsuit, must be accepted as the level at which the collision occurred.

scribed by regulations issued under" the Act. (49 U.S.C.A. §401-24) The Supreme Court of the United States declared in the case of *U. S. v. Causby*, 328 U. S. 256, 261, that "The air is a public highway, as Congress has declared."

The right of flight in navigable unused air space is now as constitutionally established as the right to walk through the public square. No one, beyond the extent of the enjoyment of his property as laid down by law, can infringe upon that right of flight. Restatement, Torts, §194, says: "An entry above the surface of the earth, in the air space in the possession of another, by a person who is traveling in an aircraft, is privileged if the flight is conducted (a) for the purpose of travel through the air space or for any other legitimate purpose, (b) in a reasonable manner, (c) at such a height as not to interfere unreasonably with the possessor's enjoyment of the surface of the earth and the air space above it, and (d) in conformity with such regulations of the State and federal aeronautical authorities as are in force in the particular State."

Comment a under §194 declares, inter alia: "The aeronaut in his exercise of his privilege of lawful flight has a right as against the possessor of the land that the latter shall not unreasonably interfere with the exercise of his privilege."

Although the record does not specify the purpose of Morris Levitz's flight, it is not contended by anyone that he was engaged in anything but a legitimate mission. The lower Court came to the conclusion that Levitz in his flight violated certain Federal and State regulations. Section 58 of The Pennsylvania Civil Aeronautics Regulations (promulgated by authority of The Aeronautical Code of Pennsylvania, Act of May 25, 1933, P. L. 1001, as amended) provides that: "Exclusive

of taking-off or landing on a licensed airport or other property designated for that purpose by the owner, aircraft shall not be flown: Section 58. Over the congested parts of populated areas or over open-air assemblies of persons except at a height sufficient to permit a reasonably safe emergency landing which in no case shall be less than 1,000 feet; *elsewhere at a height less than 500 feet.*[*] If the Pennsylvania regulations control this case, the plaintiff cannot recover because admittedly at the time of the collision Levitz was flying at an altitude less than 500 feet. However, the General Flight Rules of the Civil Air Regulations promulgated by the Federal Civil Aeronautics Board permit flying below the 500-foot level under certain conditions. Regulation 60.17 of the Federal rules declares:

"Minimum safe altitudes. Except when necessary for take-off or landing no person shall operate an aircraft below the following altitudes: (a) Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface; (b) Over congested areas. Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft . . . (c) Over other than congested areas. An altitude of 500 feet above the surface, *except over open water or sparsely populated areas.* In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure . . ."

The Court of Common Pleas of Dauphin County held that as between the State and Federal criteria of permissible minimum altitude, the Pennsylvania regulations prevailed at the time of the collision. If there

---

[*] Emphasis throughout, supplied, unless otherwise noted.

were conflict between the Pennsylvania regulations and the Federal regulations the latter would predominate. However, aside from the superiority of the Federal regulations, the facts in the case specifically adapt themselves to the Federal regulations since the pilot at the time of the fatal mishap was flying over "open water," the situation described under Subsection (c) of Regulation 60.17.

The learned Court below was of the view that at the time the pilot fell he was not flying over open water. In this respect the Court said that within a stretch of 12½ miles three transmission lines cross the river, that two islands and numerous islets occupy the stream, that the borough of Liverpool is "a short distance" (3½ miles) north of the transmission line, and that there is one dwelling within 400 feet (the record says 400 yards) of the line on the Perry County side. But these geographical observations do not decide whether the river itself at the point of the accident was open water. The term "open water", as used in the regulation, must be interpreted in the light of its land equivalent, "sparsely populated area." The witness Clarence W. Hunter testified on this subject as follows: "Q. On May 11, 1950, that was the date of the accident which you have previously described, will you tell us whether there are any homes in the area underneath the electric transmission line on the Dauphin County side? A. No, sir. Q. Will you tell us please whether there were any homes on May 11, 1950, under the electric transmission line on the Perry County side? A. No, sir." He testified also that 300 or 400 yards north on the Perry County side there were two homes and a hotel. Three human habitations some 1200 feet from the locus in quo on only one side of the river could not make the area anything other than "sparsely populated."

The river itself at the location of the transmission line at the time of the accident was as empty as the Dead Sea. Not a boat, swimmer, or fisherman disturbed the tranquil stream. Such an expanse of dead water would certainly fall under the designation of "open water." The fact that a half-mile to the north a single small steamboat was heading toward shore could not change the locus in quo to something other than "open water."

In holding that the accident did not occur on open water, the Dauphin County Court seemed to believe that open water is a synonym for open sea, but if that were true, then the phrase "sparsely populated area" in the Federal regulation would lose all significance, because, in comparison to the vast emptiness of the ocean, only a Sahara desert could qualify under the designation of "sparsely populated area."

Apparently carried away by its misconception of the meaning of "open water," as used in the Regulation, the Trial Court cited the case of *United States v. Rodgers,* 150 U.S. 249 in asserted support of its position. But the *Rodgers* case can have no possible relevancy to the question as to whether there can be open water on the Susquehanna. The *Rodgers* case decided the question as to whether the term "high seas" in a Federal statute applies "to the open, unenclosed waters of the Great Lakes." The opinion in the *Rodgers* case did not accept the term "open", (as did the Dauphin County Court), as being equivalent to "unenclosed." Many times in the opinion it used the two words, "open, unenclosed", as describing the high seas. Justice FIELD, who wrote the Rodgers opinion, in referring to an opinion written by Justice STORY in the case of *United States v. Grush,* 5 Mason 290, said: "It was the open, unenclosed waters of the ocean, or the open, unenclosed

waters of the sea, which constituted the 'high seas' in his judgment. There was no distinction made by him between the ocean and the sea, and there was no occasion for any such distinction."

The Dauphin County Court, by saying: "This opinion [the *Rodgers* opinion] refers to 'rivers, havens, creeks, basins, and bays' (page 263) generally as being different from 'open, unenclosed waters,' " endeavored to convey the idea that the Susquehanna River could never have open water because "rivers, havens, creeks, etc." are different from "open, unenclosed waters." But the quotation to which the lower Court referred, did not at all hold what the Dauphin County Court contended for it. This is what the *Rodgers* case said in that quotation at page 263: "It does not seem reasonable to suppose that Congress intended to confine its legislation to the high seas of the ocean, and to its navigable rivers, havens, creeks, basins, and bays, without the jurisdiction of any State, and to make no provision for offences on those vast bodies of inland waters of the United States."

As already indicated, the *Rodgers* case has no possible relevancy to the issue before us here, and it may be said in passing that indiscriminate citations of this character can only lead to confusion in the law.

It will be recalled that the Federal regulation forbids that an aircraft, when over open water, fly within 500 feet of a person, vessel, or structure. It is true that there is evidence in the record that Levitz did pass within 175 feet of a steamboat but he did not do it under the circumstances visualized by the Dauphin County Court which said: "The deceased flew his plane within 175 feet of a steamboat in operation and crashed into the transmission line." The picture painted by these words portrays Levitz precipitately descending

over the steamboat directly into the transmission line. The facts, however, wash away this image as entirely unrealistic. When Levitz was a half-mile away from the transmission line his airplane flew within 175 feet of the steamboat which was travelling in the opposite direction. The proximity to the steamboat and the collision with the transmission line were wholly unrelated incidents. Levitz was flying at the speed of 75 to 80 miles per hour so that the steamboat had been left far behind when the transmission line intervened its serpentine length. It took the steamboat ten minutes to get to the scene of the accident after the plane had passed it.

Because, for an evanescent moment, Levitz's course of flight took him within 175 feet of the passing steamboat, the Dauphin County Court held that he violated the Federal regulation in such a manner as to justify the compulsory nonsuit entered against the plaintiff. But the plane's proximity to the steamboat had nothing to do with the wire collision and therefore should have played no part in the Court's consideration of the motion for a nonsuit. In *Salvitti v. Throppe,* 343 Pa. 642, 644, we held that: "A plaintiff who has violated a legislative enactment designed to prevent a certain type of dangerous situation is barred from recovery for a harm caused by a violation of the statute if, *but only if, the harm was sustained by reason of a situation of that type.*" This Court said further in that case, as we can say here, that: "Since, however, the accident was not a result of the hazard contemplated by the statute, the violation of the latter was an irrelevant factor." A traveller is not burdened with an accumulation of all the untoward incidents which have happened to him on his journey. A motorist who passes a red light in Camden is not prevented, because of that fact, from re-

covering against a truck driver who crosses a line and smashes his car to smithereens in Philadelphia.

In further attempted support of its reasoning on the point of law just mentioned, the lower Court said: "Where there is no controversy concerning the manner in which an accident has happened, the proximate cause thereof may be judicially declared." This observation presupposes what is not established. There *is* controversy in this case concerning the manner in which the accident happened—considerable controversy. The plaintiff contends that Levitz was killed because the defendant had strung its wires across the river in such a manner as to make them invisible to airmen. The defendant denies that this is true. The plaintiff further contends that the towers supporting the wires were hidden behind the topography and vegetation of the land and thus were not perceptible to pilots approaching the transmission line. This is also denied by the defendant. These two elements of factual controversy alone, aside from others in the case, render it impossible for a trial court to decide, as a matter of law, the proximate cause of the collision here involved.

The lower Court sought to make factual findings which were not within its province to make. It said that the deceased pilot came to grief because he flew too low. If he had flown higher the accident would never have occurred, the Court below argues: "Altitude gives the flyer room and freedom to maneuver, enables him to view conditions on the ground in a broad field of vision and gives the flyer time to prepare for those conditions. These observations are clearly supported by the testimony in this case. Should there be an engine failure, there is nothing a flyer is so thankful for as altitude." This is an observation which does not answer all the questions which logic could propound. It

can happen, of course, that with altitude a pilot may have an opportunity to select a place on which to land, if he can land—softly. But in most instances where the engine fails, the higher the altitude the greater distance the pilot plunges. Moreover, the pilot who is flying entirely by observation must be reasonably close to the surface in order to distinguish the peculiarities of that part of the earth on which he is to land. The one possible advantage accruing to a pilot if his engine fails when he is at a great altitude is the realization that the greater the altitude the more time he will have in which to pray!

The lower Court said further: "The decedent chose to sacrifice the safety of altitude. He chose to fly below the top level of the mountain instead of over it. Flying along the river at this low altitude will only admit of one of two inferences, neither of which can help the plaintiff's case. Either the deceased knew or he did not know of the existence of the wires. If he knew of the transmission line, he should not have come down. And if he did not know of the existence of the line, clearly he should not have flown in that area at that height without knowing the terrain." Herein lies one of the major fallacies in the learned lower Court's decision and opinion. It frequently speaks of *terrain*, thus applying to this case rules which might apply to overland flights, but not to overwater aeronautics. Thus, the Court says: "At low altitudes there is always danger of coming in contact with objects on the *ground*, and this danger must be known to every pilot. A pilot flying at an altitude of 125 feet is bound to know there is danger of encountering obstacles on the *ground*. One of the dangerous consequences to be reasonably apprehended in low flying, as revealed in this evidence, is coming in contact with structures on the *ground*."

We must repeat that this accident happened while the pilot was flying over a body of water and not over an area of ground, and the only likely structure that could rise from the water would be a ship or a bridge. This, thus, would mean either a ship with a mast 185 feet high (scarcely to be expected on the Susquehanna) or a bridge at that elevation (also not to be expected on the Susquehanna). What the pilot struck in this case was not a ship or a bridge but wires which, according to the evidence submitted by the plaintiff, were invisible to the pilot.

The Dauphin County Court said that Levitz was "flying at this unusually low altitude in an area where he was in no sense required to be in the careful operation of his plane." There is no evidence that he was not required to be where he was. There was no testimony as to his destination or the nature of his mission. Nor does the evidence exclude that he could have been making an emergency landing. The fact that witnesses heard no unusual sounds from the plane's engine does not prove that the pilot may not have found himself confronted with some other situation which required him to descend to the river's surface.

Nor did the pilot's flight have the Himalayan aspect which might be suggested by the lower Court's language, i.e., "He chose at this low altitude to fly between mountain peaks and over dangerous waters." The "mountain peaks" were about the height of a good-sized hill in a lowland, and the "dangerous waters" were the placid, scarcely moving pools of the Susquehanna, known in the country round and to all tourists visiting eastern Pennsylvania to be as dangerous as a millpond or a sleepy brook.

The rationale of the lower Court's argument as reflected in its filed opinion would suggest that the plain-

tiff's decedent in some way invaded a right of the defendant. What was that right? The proprietor of a piece of land owns such airspace above it as is needed for the enjoyment of that land—but no more. No longer does he own the slice of the universe which penetrates above his property into the infinite. The people of the world are drawing close together physically, if not politically, so that each proprietor of land must relinquish title to the vast aerial spaces which have become the lanes of travel for aircraft and the channels of transportation for radio and television impulses. United States Circuit Judge HANEY, writing in the case of *Henman v. Pacific Air Transport* (Ninth Circuit), 84 F. 2d 755, 758, well expressed this concept: "We own so much of the space above the ground as we can occupy or make use of, in connection with the enjoyment of our land. This right is not fixed. It varies with our varying needs and is coextensive with them. The owner of land owns as much of the space above him as he uses, but only so long as he uses it. All that lies beyond belongs to the world. . . .

"Any use of such air or space by others which is injurious to his land, or which constitutes an actual interference with his possession or his beneficial use thereof, would be a trespass for which he would have remedy. *But any claim of the landowner beyond this cannot find a precedent in law, nor support in reason.*"

Even if the defendant company had hung its wires over land to which it had a fee simple title it still could not be indifferent to legitimate air traffic passing over it. In the case at bar, however, the defendant did not own the land beneath its transmission line. The line stretched across the Susquehanna River. The bed of the river is property of the Commonwealth. In 1856, speaking of the Cowanesque River, this Court said that

it "is a public highway, and as such is open to the use of the public for the purposes to which it is applicable." In *Flanagan v. The City of Philadelphia*, 42 Pa. 219, 228, speaking of the Schuylkill this time, we said: "There is no natural right of the citizen, except the personal rights of life and liberty, which is paramount to his right to navigate freely the navigable streams of the country he inhabits. It is superior even to the right of fishing, which contributes to the food on which the community subsists, for it has been judicially decided that when the rights of navigation conflict with the rights of fishing, the latter must give way to the former."

The defendant company possesses no proprietary rights in the Susquehanna River and can in no way label as trespassers boatmen on the water or airmen above the water. No one can curtail the rights of a citizen using the rivers of the Commonwealth in acquatic or aerial navigation, so long as the citizen remains within the laws and regulations prescribed by the constituted authorities.

In its brief filed here the defendant says: "There was no need for Levitz to be where he was (the river not being directly beneath a federal airway)." But this statement ignores the highly useful purposes of a river to a pilot of small aircraft flying by visual observation alone. A river is to such an aeronaut what a curbstone is to a blind man with a cane, guiding him through unknown and unseen territory to his destination.

The Dauphin County Court proceeded throughout this litigation on the mistaken assumption that the defendant company was a landowner entitled to all the rights of a landowner in the space above his land. But whatever rights the defendant company had in the space above the river because of its transmission line

had to be shared with the rights of all others lawfully using the river. Speaking on this subject the lower Court said: "We are here concerned with the general proposition involving relative rights of one in possession of the surface to make use of his property as against the right of a pilot of an airplane to engage in such a low altitude flight as to crash into that property . . . The defendant had a dominant right in this area, and we think this dominant right certainly was not truncated at water's edge." But the defendant did not have a dominant right in this area. Whatever may have been its dominant rights on the hilltop, they were severed by the shears of sovereignty when they descended to the Susquehanna shores. The defendant had permission and license to cross the river with its wires, but it had no right which dominated over the right of the people (including airmen) to use the river.

The defendant stresses the fact that it had obtained license or consent of governmental authorities to span the river with its wire, but this license did not immunize the company from responsibility for negligence or for creating a hazard to the public. What was said in the case of *Seaboard Air Line R. Co. v. The Pan Maryland, DC-Ga.,* 105 F. Supp. 958-964, would be applicable to the case here: "It is inconceivable that there could be any basis in law or in fact for Seaboard's contention that once its bridge was approved by the Secretary of War, it could not constitute a hazard and that, in the absence of a specific directive from the Secretary of War to alter the bridge, the Railroad was powerless to initiate any steps toward correcting the extremely hazardous and unsatisfactory condition existing at the bridge insofar as navigation was concerned."

The lower Court seemed to be of the impression that the defendant company owed Morris Levitz no duty at

all. If, for no other reason, it certainly at least owed him the duty not to improperly use its property so as to injure him: "The owner must either govern himself by the rule of the maxim sic utere tuo ut alienum non laedas, or the law, acting through courts of equity, may compel him to do it." *Sparhawk v. Union Passenger Railway Co.*, 54 Pa. 401, 429. "Everyone must so use his property as not to injure others." *Ladner v. Siegel*, 293 Pa. 306, 310.

But the power company, of course, owed more than a negative duty to the deceased pilot. That a transmission line is a dangerous instrumentality is recognized everywhere. No matter where located it is a source of grave peril and the law requires that the possessor of such an instrumentality exercise a high degree of care: "Vigilance must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question." *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, 396.

Did the defendant measure up to its responsibility in this regard? Was it negligent in the manner in which it erected and maintained its installation at Berry Mountain Gap? We said in *Adley Express Co. v. Willard*, 372 Pa. 252, 258 that: "The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm . . ., resulting from his act."

The plaintiff reasonably contends that the defendant could well have anticipated and foreseen the likelihood of harm resulting from the manner in which it maintained its installation at Millersburg. There was

evidence that in 1950 there were 125 licensed air fields within a 60-mile radius of the defendant's transmission lines and that 1,333 licensed aircraft were based within that area. It was testified that small aircraft, such as was the decedent's plane, invariably navigate by what is known as contact flying, that is, by visual observation of the country beneath, rather than by the use of instruments within the plane. With contact flying the pilot finds his way through perception of prominent landmarks such as highways, rivers, and railroads.

The Susquehanna River in the Millersburg area is an excellent guide for the pilot because it is easily distinguishable from the air on account of its width, unique contour, and containment of islands, as well as the fact that it is flanked by two highways and a railroad. In adhering to river courses, pilots are on the alert for bridges, cables, transmission lines, and all other types of spans traversing the stream. Transmission lines are ordinarily detected with facility because of their supporting towers which rise on either side of the river and because the wires themselves are of a texture or color which make them conspicuous. However, it is the position of the plaintiff in this case that the transmission line of the defendant into which Levitz crashed with fatal results was made of such material that it blended into the atmospheric coloration and thus was not visible to the naked eye. Also, that the towers on the hilltops holding up the wires were concealed within trees, bushes, foliage and rock which hid them entirely from the vision of the aviator. Lowell R. Wright, aeronautical consultant, testified that he flew over the defendant's installation and could not see the towers or wires although flying at an altitude of 800 feet.

The plaintiff presented considerable testimony, to which the lower Court scarcely made any reference in

its opinion, as to what the defendant could have done to render its transmission line perceptible to pilots flying their craft in that vicinity. An expert on the subject testified: "Q. Will you describe for us the method then of painting the supports? A. Your international orange and white colors are alterated, with the base color and the top color being the same. In other words, if the base is international orange, the top stripe must be international orange. And the stripes are, depending on the height of the tower, from 18 inches wide not to exceed 40 feet I believe it is. . . . Q. Now, sir, will you explain how the lights are installed on the supports? A. You have side lights, as we call them, which are red usually, 100 watt bulb, burning steady, with a millimeter, rather 300 millimeter beacon, red beacon, flashing at the top. Q. Is that both day and night? A. Yes, sir, they can be used either day or night. Q. But are they? A. Yes, sir. Q. Do you use those in broad daylight? A. Yes, sir . . . Q. In order to mark the area of an obstruction over a river, what was the usual and customary method in use in 1946 through 1950? A. What is known as haz markers were used to mark hazardous areas at such locations. THE COURT: Haz markers were used, and strike out the rest of the answer. Q. Will you describe a haz marker? A. Yes, sir. It is a combination of three letters, HAZ, built up off of the ground or water out of either wood or metal material, in strips, approximately 20 inches wide, the three letters themselves would cover an area of about 30 feet and they are painted international orange color and equipped with red lights."

If so marked the towers would have been visible two or three miles away to a pilot flying at only 500 feet altitude.

The expert testified to the appearance of a transmission line south of the defendant's line: "Q. Can you observe that line? A. Yes, sir. Q. Will you tell us why? A. Because you can see the towers, they are painted an aluminum color, an aluminum or light gray. The strands, the cables appear to have, or rather appear to be aluminum coated or something of that nature, and the wires themselves standout above the foliage and the ground underneath and also the towers stand out. It is a very prominent land mark at that crossing."

He also testified with regard to a transmission line 13 miles south of Clarks Ferry: "But they are using a different type of towers. You can see the towers ten miles away. You can see the lines, you can see the wires because they happen to be aluminum coated. These other wires, you can't; they blend into the foliage on the ground. You can't see them at all."

It appears that the supports for the transmission lines are usually four-legged towers, whereas the defendant company's supports were single, narrow I-beams completely buried within the surrounding trees and foliage. The removal of the encompassing vegetation would have brought these beams within the range of the vision of airmen in the area. The wires also, it was testified to, could have been made conspicuous by applying over them an aluminum covering.

There was testimony that on the day of the accident, when Levitz was a mile and a half from the transmission line, he was flying at an altitude of from 500 to 600 feet. It was a question for the jury to determine whether, if the towers had been marked as described or if the vegetation cloaking them had been removed, Levitz could have seen them and thus been warned of the transmission line ahead. It was testified also that with the Piper Cub's cruising speed of from 70 to 80

miles per hour, Levitz, after seeing the towers, could have either reversed his course or, climbed to a higher level in plenty of time to avoid the fatal wire.

The lower Court devoted some discussion to the question whether custom and usage were to be considered in deciding whether transmission lines have been properly erected, marked and maintained. The issue here is not one of custom. It is whether the defendant maintained its line in a manner which displayed a due regard for the safety of others. In developing the theme that the line was not maintained with due care, expert testimony is permissible to show how, in the opinion of the expert, the line should have been constructed and maintained. In this respect, the expert may draw on his knowledge and experience with regard to other comparable towers, this, not to show custom and usage but to illustrate, explain and expound his opinion on proper maintenance.

Section 290 of the Restatement, Torts, points out that: "For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is assumed to know (a) the qualities and habits of human beings and animals and the qualities, *characteristics and capacities of things and forces* in so far as they are matters of common knowledge at the time and in the community."

Did the presence of the numerous air bases and the activities of the numerous airplanes in the vicinity of Millersburg constitute a situation which put the defendant company on notice that its transmission line could be an obstruction to air navigation? If it did, the defendant owed a high degree of care to aviators approaching or passing over that transmission line. If, in fact, its towers and transmission line were invisible to aviators using their normal faculties for detection,

and if as a result of that invisibility or difficulty of detection, the pilot Levitz lost his life, the company would be responsible in damages to the administrator of his estate. If the owner of any instrumentality, equipment, or device has reason to believe or expect that an airplane will use the legalized unoccupied air space above his installation and he erects or permits to exist an obstruction which, without fault on the part of the aviator, will do damage to the pilot or his aircraft, the owner of the installation will be as responsible for the damage done the aircraft and its passengers as if he had shot down the aircraft. Section 500 of the Restatement, Torts, epitomizes this principle: "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him."

Comment d under Section 500 illustrates this principle: "If the actor's conduct is such as to involve a high degree of chance that serious harm will result from it to anyone who is within range of its effect, the fact that he knows or has reason to know that others are within such range is conclusive of the recklessness of his conduct toward them. It is, however, not necessary that the actor should know that there is anyone within the area made dangerous by his conduct. It is enough that he knows that there is strong probability that others may rightfully come within such zone."

The defendant formally admitted that it did nothing to acquaint pilots with the existence of its towers and transmission line. In answer to an interrogation

it said: "Nothing . . . to mark the electric transmission lines or the surrounding area so as to make the location of the lines known to pilots."

Whether the defendant knew of the dangers attendant upon its transmission line was a question of fact to be determined not only from all the physical conditions surrounding the installation, including the considerable aircraft activity in the area, but also from the knowledge it possessed that another plane had already collided with the wire prior to the Levitz accident. The plaintiff produced evidence that on October 7, 1947, an Aeronca airplane piloted by Lawrence Seifert struck the defendant's transmission line. This evidence was relevant and proper. In the case of *Ringelheim v. Fidelity Trust Co.*, 330 Pa. 69, 71, this Court, speaking through Justice STERN, now Chief Justice, said: "Authorities are almost unanimous in holding that evidence of the occurrence of similar accidents is admissible for the purpose of establishing the character of the place where they occurred, their cause, and the imputation of notice, constructive at least, to the proprietors of the establishment, of the defect and the likelihood of injury."

The plaintiff offered to show that on December 5, 1950, still another accident occurred when a helicopter collided with the transmission line. The Trial Court excluded evidence of this later accident, but it has been held that such evidence is proper if it sheds light on the question as to whether the defendant exercised reasonable care or not. In *Fisher v. Pomeroy's, Inc.*, 322 Pa. 389, the plaintiff was injured when, her heel catching in the corrugations of a metal tread in a stairway maintained by the defendant's department store, she fell and was injured. There was testimony of other incidents of injury both preceding and following the ac-

cident which injured the plaintiff. This Court, speaking to the question through Justice LINN, said : "The evidence of previous and subsequent falls at the same place is not, alone, proof of negligence, but is to be considered by the jury with the fact that defendant maintained a store to which it invited customers; from all the evidence the jury must determine whether the defendant exercised reasonable care or not."

It is of significance that although the defendant objected to the introduction of testimony on the first and third accidents at the transmission wire, it admitted in its brief that these accidents had occurred and argued that this was proof that the wire could not have been a very dangerous instrumentality. The following is taken from the brief filed by defendant's counsel: "As to the risk not being an unreasonable one, we add the thoughts expressed by plaintiff in his own brief where he clearly sets forth that within a 60 mile air radius of the power line there were registered 113 air fields and 1352 airplanes, . . . and yet in a period of over seven years there resulted only a total of 3 collisions with the wire! We know of no more forceful argument that demonstrates the slight risk of harm to aviators flying carefully and lawfully." (Exclamation point in defendant's brief.)

Three airplane collisions (one resulting in death) may seem to the defendant as being but a "slight risk of harm to visitors", but the law does not allow anyone to install or maintain any instrumentality which to his knowledge may pull airplanes down from the sky and inflict serious injury or death on their occupants. The fact that since the wire was strung across the river, three airplanes have struck it, is an item of evidence to be considered with the rest of the testimony in determining whether the installation was one likely to cause injury.

Louis Miller, co-owner of the fatal plane, testified that the plane carried two aeronautical maps of the area, neither one of which showed the defendant's transmission line. The lower Court dismissed this testimony with the statements: "Actually there is no testimony connecting the deceased pilot with either of these charts." "There is simply no testimony to show that the pilot was flying by any maps at the time of the accident." The record shows the following: "Q. Do you know how many air maps that airplane carried? A. Two. Q. Can you tell us what air maps were carried in airplane? A. Well, one was a CAA aeronautical map and the other was a Pennsylvania aeronautical map. Q. Now, when you refer to the CAA aeronautical map, of what section did that aeronautical map cover? A. Pennsylvania. Q. Do you know what dates of issue those maps were? A. I do know they were current maps, they were new."

Whether Levitz had these maps with him on the day of the accident is not the vital feature of this testimony. What is of importance is that two standard maps of the locality fail to reveal the dangerous instrumentality maintained by the defendant, and, as such, it is evidence to be considered in connection with the plaintiff's contention that the transmission line and the towers were obscured or concealed.

The defendant says in its brief that: "The *social value of the electrical industry's* contribution to the public interest is beyond computation or description even though it may exact a certain toll of human life as its price." (Italics in original text.)

Accepting this statement as a basis for reflection, there is no reason, where preventable, that there should be *any* toll of human life. We said in *Brillhart v. Edison Light & Power Co.*, 368 Pa. 307, 312, quoting with

approval from R.C.L. and other authorities that: "When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense." In comparison to the benefit of saving human life, the cost of a few cans of paint and a few electric bulbs would be negligible. And since the defendant company is engaged in the very manufacture and creation of electric current, the cost of the current needed to supply the desired illumination would be as insignificant as the cost of a few bread crumbs in a bakery.

One other point will be considered. The Trial Court allowed, on the basis that the statement was part of the res gestae, a witness, Chas. O. Barner, to testify as follows: "I made the remark about the plane flying low." Without ruling on whether this was properly res gestae, we deem the testimony inadmissible because it expresses a view which is too indefinite and merely comparative. It has no more probative value than the expression of a witness that an automobile was "travelling fast." (*Wertz v. Shade,* 121 Pa. Superior Ct. 4, 9.)

Reversed with a venire facias de novo.

Mr. Justice BELL dissents.