Ruth HAHN, Special Administrator of the Estate of Barbara Ruth Hahn, Plaintiff,

v.

UNITED STATES of America and James Kostboth, Defendants.

No. Civ. 78–4107.

United States District Court, D. South Dakota, S. D.

March 17, 1982.

---

John N. Gridley, III, Sioux Falls, S. D., for plaintiff.

Philip N. Hogen, U. S. Atty., by John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., for defendant United States of America.

Gene E. Pruitt, Sioux Falls, S. D., for defendant James Kostboth.

## MEMORANDUM OPINION

JONES, District Judge.

The court assumes jurisdiction of this wrongful death action under the Federal Tort Claims Act, 28 U.S.C. 1346(b), and 28 U.S.C. 2671, et seq.

Plaintiff is the special administratrix of the Estate of Barbara Ruth Hahn, who on October 17, 1975, was a passenger in the private plane piloted by James Kostboth. At approximately 12:30 a. m., Kostboth's plane struck an electrical cable on a power transmission line approximately five miles north of the Yankton, South Dakota, airport. Immediately following this impact, the plane crashed, killing Barbara Hahn.

Plaintiff alleges that pilot Kostboth and the United States Government are liable for

the crash. Plaintiff also claims that, following the crash, Kostboth wrongfully converted decedent's diamond engagement ring, which he had previously given to her.

To facilitate its review of this case, the court will first address plaintiff's claim against pilot Kostboth.

## I.

Since the evidence establishes that Barbara Hahn was a guest in the airplane operated by Kostboth, the claim against Kostboth is governed by S.D.C.L. 50–13–15:

> No person transported by the owner or operator of any aircraft as his guest without compensation for such transportation shall have cause of action for damages against such owner or operator for injury, death, or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the owner or operator of such aircraft, and unless such willful and wanton misconduct contributed to the injury, death, or loss for which the action is brought; no person so transported shall have such cause of action if he has willfully or by want of ordinary care brought the injury upon himself.

The South Dakota Supreme Court has construed this "willful and wanton misconduct" standard in numerous automobile guest statute cases, holding that the proscribed conduct is "more akin to an intentional tort than to negligence." *Chernotik v. Schrank*, 76 S.D. 374, 79 N.W.2d 4 (1956).

Commenting on the marked difference between negligence and willful and wanton misconduct, the court in *Wittmeier v. Post*, 78 S.D. 520, 105 N.W.2d 65 (1960), distinguished the two standards as follows:

> Negligence is the failure to exercise ordinary care under the circumstances. Intent is not an essential element. Willful and wanton misconduct on the other hand involves something more. It involves 'conduct which partakes to some appreciable extent, though not entirely, of the nature of deliberate and intentional wrong.' It is the element of deliberate recklessness which differentiates willful

and wanton misconduct from ordinary negligence. (citations omitted)

Id. at 526, 105 N.W.2d at 68.

To establish willful and wanton misconduct, plaintiff bears the burden of proving that Kostboth consciously performed an act with the realization that his conduct would in all probability (as distinguished from possibility) produce the precise result which it did produce and would bring harm to Barbara Hahn. *Kelly v. Kelly*, 89 S.D. 58, 228 N.W.2d 332 (1975); *Brewer v. Mattern*, 85 S.D. 356, 182 N.W.2d 327 (1970); *Melby v. Anderson*, 64 S.D. 249, 266 N.W. 135 (1936).

■ The evidence of either Kostboth's conduct or his state of mind before the crash fails to establish such misconduct under an objective or a subjective standard.

Defendant Kostboth was a relatively inexperienced pilot with approximately ninety-one hours of flight time at the time of the accident. This included thirty-five hours of pilot's training and only ten hours of night flying time. Because he was not instrument rated, he flew solely by Visual Flight Rules (VFR).

Before October 16, 1975, when the decedent and Kostboth left Sioux Falls, Kostboth had never flown into the Yankton airfield. Although he conducted a preflight examination of the pertinent aeronautical charts, which disclosed the existence and the location of power transmission lines in the Yankton vicinity, Kostboth had not noticed the lines from the review of the charts or from his visual observations during the flight from Sioux Falls to Yankton near dusk on October 16. He made no other attempt to familiarize himself with the terrain.

Kostboth and Barbara Hahn returned to the airport at approximately 12:15 a. m. after attending a concert and having a late dinner in Yankton. The weather was clear and calm, with a 10,000-foot ceiling.

Pilot Kostboth filed no pre-flight plan, requested no special flight information at the airport, or reviewed any of his aeronautical charts, which he had previously marked from his trip to Yankton. After con-

ducting a routine pre-flight check of the aircraft, Kostboth took off from the airport, thereafter assuming a standard traffic pattern and climbing to an elevation of 1800 feet—the requisite minimum height of 500 feet above the 1300-foot elevation of the Yankton airport. *See* 14 CFR 19.79. Following a practice common among pilots in this area of the country, Kostboth next set the aircraft's gyrocompass by lining up with Highway 81, which runs north and south through Yankton. Concentrating on this adjustment for 30 to 45 seconds, Kostboth was unaware that he had lost substantial altitude, until he saw the transmission lines moments before impact. He immediately attempted to climb but was unsuccessful in clearing the lines.

The evidence shows that the aircraft struck the transmission line approximately 135 to 140 feet above ground. The land elevation at the crash site was approximately 1400 feet, placing the impact at 1535 feet or 235 feet above the Yankton airport.

Kostboth's testimony concerning the difficulty in visually gauging altitude at night, particularly in this low-winged Piper PA–28 aircraft, and of his initial preoccupation with calibrating the gyrocompass was supported by the unrebutted testimony of defense expert Russell Barstow, who heard all testimony relevant to this flight. Barstow, a retired Federal Aviation Administration (FAA) designated pilot examiner and a certified flight instructor, described Kostboth's loss of altitude "as happening many times" to a pilot with low night flight experience who becomes slightly disoriented and preoccupied. Based on his experience, Barstow also concluded that it is common for an inexperienced pilot, like Kostboth, to divert his attention from the rest of the aircraft while adjusting one particular instrument.

Although Kostboth was obviously negligent in his failure to maintain altitude[1] and in not adequately familiarizing himself with the available aeronautical charts, plaintiff has not sustained her burden of proving any

willful and wanton misconduct. Particularly, her reliance on *American Airlines v. Ulen*, 186 F.2d 529 (D.D.C.1949) is misplaced. Unlike the evidence presented in the instant case, the willful and wanton misconduct of the pilots in planning and executing their flight plan in *Ulen* was clearly proven. The record there demonstrated that an undisputably and obviously dangerous flight path near a mountain was planned and executed by experienced commercial pilots who had flown the same route many times before. Because the airline's flight charts clearly indicated the height of the mountain, the trier of fact could have reasonably concluded that the pilots deliberately and wantonly violated altitude restrictions, set by the Civil Aeronautics Board, when they used that flight plan at that preplanned altitude. Thus, there is a clear factual distinction between Kostboth's inadvertent loss of altitude, as an inexperienced pilot flying a new route at night by VFR, and the knowing adherence by experienced commercial pilots to a flight plan that was obviously unsafe at the predetermined altitude.

 Finally, the court summarily dismisses plaintiff's nominal challenge to the constitutionality of the aircraft guest statute. The presumption in favor of a statute's validity places a heavy burden on the assailant, who must prove the statute's unconstitutionality beyond a reasonable doubt. *State v. Brown*, 296 N.W.2d 501 (S.D.1980); *State Theatre Co. v. Smith*, 276 N.W.2d 259 (S.D.1979). In refusing to follow the California Supreme Court's lead in holding its automobile guest statutes unconstitutional, a South Dakota Supreme Court Justice recently noted that "one who assails a classification in a law 'must carry the burden of showing that it does not rest upon any reasonable basis but is essentially arbitrary, and not merely possibly, but clearly and actually unreasonable.'" *Behrns v. State*, 89 S.D. 96, 229 N.W.2d 86, 93 (1975).

---

1. 14 C.F.R. 91.79(c) requires a pilot to maintain an altitude of 500 feet over any structure. Moreover, the testimony of a flight examiner indicated that for flight certification even inexperienced pilots must maintain their current altitude within 200 feet during the flight test.

Plaintiff, without even attempting to address these issues, has fallen well short of sustaining her onerous burden of proof of demonstrating the unconstitutionality of the statute.[2]

## II.

■ Plaintiff's claim against the government is twofold: First, she alleges that the government negligently failed to accurately and adequately depict the existence of the transmission line and its altitude on the aeronautical charts of the Yankton vicinity. Second, plaintiff contends that the government was negligent in not placing warning lights on the transmission towers to demarcate the line at night. Plaintiff further asserts that these acts and omissions of the government proximately caused the accident. It is undisputed that the electrical lines were not lit and that their actual height was not specifically indicated on the aeronautical chart.

The evidence shows, however, that the government did comply with all relevant administrative regulations in maintaining this transmission line. Although compliance with governmental regulations is certainly not conclusive of the negligence issue, plaintiff has not sustained her burden of proving that the government breached any duty to warn in this case. ·

The evidence clearly shows that, on the date of the accident, the transmission line was accurately reflected on the pertinent aeronautical charts with appropriate and recognizable symbols. (See defendant's exhibits 5 and 6). Furthermore, since the transmission line was well below the 200-foot level considered an obstruction to air traffic by FAA standards,[3] and since there is no evidence that these standards were unreasonable or arbitrarily set, the Inter-Agency Air Cartographic Committee of the National Ocean Survey was not negligent in failing to indicate the height of the 162-foot towers on the aeronautical charts. Notably, the charts did accurately show a maximum terrain elevation of 1900 feet for the general area in the flight pattern back to Sioux Falls. Had the pilot maintained even that minimum altitude, this particular accident would have been avoided.[4]

■ The issue of whether or not the government had a duty to light the transmission line at night is more difficult. Plaintiff cites a number of cases where the trier of fact found that the failure to visually demarcate a power line breached a duty to warn under the circumstances. Upon a careful review of the evidence in this case, however, the court finds that plaintiff has not sustained her burden of proving that the government breached any duty by not installing warning lights on this line.

Notably, the government has again shown that, pursuant to long-standing guidelines of the Federal Aviation Administration, neither the transmission lines nor their supporting towers constitutes an obstruction to air traffic for reporting, marking or charting purposes.[5]

Although plaintiff relies on *Mills v. Orcas Power and Light Co.*, 56 Wash.2d 807, 355 P.2d 781 (1960), for the proposition that the owner of a powerline has a duty to warn fliers of its presence, the lines in *Mills* were approximately 100 feet from the south end of the air strip, clearly an obstruction to the proper take off and landing of aircraft. The duty to warn in *Mills* arose from the implied invitation and promise of a safe landing strip at that airport. Any claim that the transmission lines impaired a proper take off or landing at the Yankton airport, however, is simply not supported by the evidence.

---

2. Nor has plaintiff adequately raised the constitutional challenge under state law. S.D.C.L. 15–6–25(c) requires that a party asserting the unconstitutionality of an act notify the state attorney general in time for him to intervene, unless the state is already a party to the lawsuit. That has not been done here.

3. *See* C.F.R. 77.32(a)(2) and 14 C.F.R. 77.-13(a)(1).

4. See part III of this opinion, in which the court further addresses the causation issue.

5. 14 C.F.R. 77.13(a)(1), 77.23(a)(2).

The other cases cited by plaintiff are similarly distinguishable on their facts.[6] Generally, these cases involved utility lines that span an inherently hazardous gulf, such as a valley, river, or open water, and where the towers on either side of the gulf were inconspicuous for some reason—a trap to the unwary. In all but one of these cases, previous aircraft accidents involving the lines added support to the trier's finding that an unmarked line at this particular location was a foreseeably dangerous obstacle to air traffic in the vicinity. Here, on the other hand, there is no indication that the government considered or had reason to believe that this transmission line posed any particular hazard to air traffic in the vicinity. The only available evidence would indicate that a pilot taking off from the Yankton airport has adequate time to execute a standard flight pattern before reaching the transmission lines five miles away.

Consequently, the court finds for the defendant government on plaintiff's negligence claim.

### III.

Even positing the government's negligence, however, the court finds that defendant Kostboth's negligence was the sole proximate cause of the crash.

The requirement of proximate cause excludes the idea of legal liability based on mere speculative possibilities or circumstances and conditions remotely connected to the events leading up to an accident. In considering whether negligent conduct is a substantial factor in producing harm to another it is important to consider (1) the number of other factors which contributed in producing the harm, (2) the extent to which those factors produced the

harm and (3) whether the actor's conduct has created a force that is continuous and active up to the time of the harm or is harmless in itself unless acted upon by other forces for which the actor is not responsible. *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884, 887 (1971).

The evidence elicited at trial shows that there were no mechanical difficulties with the airplane. Moreover, the weather wasn't a factor. At the time of the crash, it was a clear, calm night without any unusual visual problems for pilots operating under visual flight rules. An adequate pre-flight review of the pertinent aeronautical charts would have directed the pilot's attention to the location of the lines and the area's maximum terrain elevation of 1900 feet— below which it is unsafe to fly and above which he would have missed the line. Furthermore, Kostboth failed to observe these power lines when he flew into the Yankton airport around dusk, although his flight pattern would have necessarily crossed over the lines. In addition, the pilot did not discuss the physical layout of the Yankton airport with anyone, in an attempt to recognize any particular difficulties that might be encountered. Flying at normal speed for a Piper aircraft, the pilot was inattentive for perhaps over a mile before he struck the power line. All of these circumstances militate against the pilot's assertion that he would have avoided the line had it been marked. The failure to properly prepare for the flight, to maintain the requisite altitude, and to attentively conduct the visual flight resulted in this crash.

### IV.

James Kostboth and Barbara Hahn were engaged to be married in 1976. Prior

---

**6.** *El Paso Natural Gas Co. v. United States*, 343 F.2d 145 (9th Cir. 1965) (a 1900-foot span from a land-based Coast Guard Station to an island, equalling a trap which had occasioned a prior aircraft collision); *United States v. Washington*, 351 F.2d 913 (9th Cir. 1965) (a 2260-foot line spanning a valley, 430 to 525 feet above the valley floor, with towers on opposite sides of the valley); *McCauley v. United States*, 470 F.2d 137 (9th Cir. 1972) (lines suspended 94- feet high over a lake had been the cause of one prior air collision); *Yoffee v. Pennsylvania Power and Light Co.*, 385 Pa. 520, 123 A.2d 636 (1956) (towers supporting the line, which spanned a river, were invisible in the trees along the bank; lines not shown on chart; expert testing on how the lines should have been marked; prior accidents with this span; no evidence of pilot negligence in flying over open water).

to the accident Kostboth had given Miss Hahn a diamond engagement ring, which he removed from her finger after his attempts to revive her proved unsuccessful. Plaintiff's fourth cause of action prays for either the return of the ring or its value, which is $1,000.

The issue presented here, whether an engagement ring given in contemplation of marriage can be recovered by the donee's estate when the contemplated marriage fails to occur because of the death of the donee, appears to be one of first impression in this jurisdiction. Although S.D.C.L. 43–36–3 states that "[a] gift, other than a gift in view of death, cannot be revoked by the giver," the case law seems to distinguish engagement rings from other gifts on the basis of the marriage pledge. Indeed, neither party has claimed or cited as controlling any South Dakota statutory law. In the absence of any controlling authority from this state, this court must look to applicable decisional law from other jurisdictions, the general principles underlying engagement ring cases, and the factual situation present in this case.

Relying on the general concept that a gift of an engagement ring is conditioned on the consummation of the marriage, defendant cites a major portion of Annot. 24 A.L.R.2d 601,[7] section 14, pp. 602–04, to support his position that the ring is not recoverable because the marriage was precluded by the death of the donee. Most of the authority cited in that annotation, however, involves cases where the engagement was cancelled by the agreement of the parties or by one party unilaterally; it is distinguishable on that factual difference.[8] Dicta in two cases,[9] though, address the situation of a

death before marriage and lend some support to defendant's position.

The plaintiff relies on *Urbanus v. Burns*, 300 Ill.App. 207, 20 N.E.2d 869 (1939), where the court denied the donor recovery of an engagement ring he had given to his fiancee, whose death had prevented the marriage:

At the time the articles of jewelry were presented, both parties knew that according to the course of nature, either one of them might die before the marriage was consummated. Had Loretta lived and had plaintiff declined to marry her, he could not recover the jewelry of the value thereof. Had he died before they became married, his personal representatives could not recover the jewelry for the benefit of his estate. At the time of her death, Loretta had a right to the possession of the jewelry as against all persons. She did not at any time break the contract to marry plaintiff or refuse to marry him. She was the owner of the jewelry at the time of her death and she did not breach the marriage troth. Hence, plaintiff had no right to claim the recovery of the same as against her brother and sisters or personal representative.

*Id.* 20 N.E.2d at p. 871.

I find for the plaintiff on this issue. The marriage was prevented by the negligence of the defendant. Since defendant is thereby responsible for breaking the engagement, I find that he had no right to recover the ring. *Beer v. Hart*, 153 Misc. 277, 274 N.Y.S. 671. The representatives of Barbara Hahn's estate are entitled to either the diamond ring or its value. *Urbanus v. Burns*, 300 Ill.App. 207, 20 N.E.2d 869 (Ill.App.

---

7. This Annotation has been superceded by 46 A.L.R.3d 578; see section 14, pp. 606–608.

8. The general rule in these cases is that an engagement ring is recoverable if the engagement has been cancelled by the agreement of the parties or broken by the donee; it cannot be recovered, however, if the donor has unjustifiably broken the engagement. *See generally* 38 Am.Jur.2d, Gifts, § 84.

9. These cases, *Cohen v. Seller*, 1 K.B. 536, 15 B.R.C. 85 (Eng.1926) and *Ruehling v. Hornung*,

98 Pa.Super. 535 (1930), are cited and discussed in 12 A.L.R.2d 601, §§ 12 & 14:

In *Cohen*, the court said, in dictum, that where a prospective marriage is prevented by the death of the donor, the engagement ring and other conditional gifts may be recovered from the donee—the opposite of the situation here. Dictum in *Ruehling* indicates that the engagement ring should be returned in the event of the death of either donor or donee. *Id.* at p. 509.

1939); see *Cohen v. Bayside Federal Savings & Loan Assoc.*, 62 Misc.2d 738, 309 N.Y.S.2d 980 (1970). Consequently, plaintiff is awarded the value of the ring, which is $1,000. S.D.C.L. 21–3–3 (1979).

### V.

Any issues not specifically addressed herein have been reviewed and are found to be either without merit or rendered moot by this decision.

This opinion shall serve as the court's findings of fact and conclusions of law under Rule 52. Judgment will be entered accordingly.