Donald E. TAYLOR, Respondent,

v.

**DALE–FREEMAN CORPORATION,**
Appellant.

No. 50591.

Supreme Court of Missouri,
Division No. 1.

March 8, 1965.

Motion for Rehearing or Transfer to Court
En Banc Denied April 12, 1965.

Hale Houts, J. D. James, Houts, James, McCanse & Larison, Kansas City, for respondent.

Hilary A. Bush, B. Kent Snapp, Johnson, Lucas & Bush, Kansas City, for appellant.

HOUSER, Commissioner.

Action for damages for personal injuries, medical and hospital expense, and loss of earnings by Donald E. Taylor against Dale-Freeman Corporation. Judgment for plaintiff was entered on a jury verdict for $19,455.02. Defendant has appealed from the judgment, contending that there was no evidence of negligence on the part of defendant and that plaintiff was guilty of contributory negligence as a matter of law.

Plaintiff, a receiving clerk at the Burnett Meat Company dock in Kansas City, was injured when defendant's truck crushed him while backing into the dock to make a

delivery of meat. The dock was enclosed. There were five doors on the south side, through which deliveries of meat were received. The doors were inset 14 inches from the outside wall. The floor of the dock extended to the outside wall. This made a ledge 14 inches wide outside the doors. Standing room on the ledge was 17 inches because a wooden bumper 3 inches in width and 8 feet long was attached to the foundation on the outside of the dock, flush with the dock, put there to protect the foundation from trucks backing into the dock to make deliveries. The floor of the dock was 3 or 4 feet above the level of the cement pavement used by delivery trucks coming and going in the unloading area. The paved unloading area sloped slightly away from the dock. Defendant's delivery truck would be driven into the area and backed up to "doorway two," where plaintiff worked. Sometimes the driver would turn the engine off. At other times he would leave the engine running through the unloading operation. Customarily the driver would get out of the truck, walk around it to the office steps, go up the steps back through the cooler part of the dock to the door where his truck was parked. There he would enter the rear of his truck, and hand out to plaintiff the articles to be delivered. Rules did not permit plaintiff to enter the truck. Rules scheduled a coffee break at 10 a. m. Plaintiff was required to stop for the coffee break whether the truck was unloaded or not. Defendant's driver knew this and was always in a hurry to complete delivey prior to the coffee break in order to avoid having to wait until after the coffee break. On the day in question plaintiff was standing on the dock awaiting the arrival of defendant's truck. The truck reached the dock at 10 minutes before 10 a. m. Plaintiff and defendant's driver, Charles Johnson were well acquainted and had performed unloading operations at the dock two or three times a week for several years. As Johnson drove the truck through the gate into the unloading area on the meat company lot plaintiff

saw the truck, waved at Johnson and said "Hello." As Johnson was driving into the lot he saw plaintiff standing on the ledge of doorway two on the dock. Johnson waved at plaintiff. Standing on the ledge of the doorway plaintiff was in a safe place where he could not be struck by a truck backing up to the dock. Plaintiff had no difficulty standing there. Plaintiff waved and gestured motioning Johnson to come back. Johnson made a right turn, then "cramped his wheels" to the left and started to back the truck toward the dock. It was an International vantype truck, the cab and body consisting of one unit. The truck bed was 7 or 8 feet wide. The tail gate consisted of a chain gate over a tarpaulin: criss-cross chains which latched on the right 3 or 4 feet above the floor of the bed. The truck could be unlocked after the truck had been backed up against the dock. The dock doorway was 5 feet 4 inches wide. A driver backing toward the dock gets a line on the left side of the door, "lines up" on the door facing, and guides the truck by watching the left rearview mirror. There was no way to look through the body of the truck to the rear. When the truck backed to a point 15 to 20 feet short of the place where plaintiff was standing the driver's view of the dock door would be obstructed by the truck; the driver would lose sight of one standing in plaintiff's position on the dock. The truck continued straight back slowly, at normal backing speed of 2, 3, maybe 5 m. p. h., until it hit the dock "square" or flush against the bumper, and became motionless, just about centered on the door. Plaintiff was still standing on the 17-inch ledge of the dock outside the door when the truck touched the bumper. This backing operation took 15–20 seconds, during all of which time plaintiff was completely out of the view of the driver. Plaintiff had "pulled the door to" behind him and was holding onto the handle of the dock door with his left hand as "an added precaution" to keep from falling off the dock. He had been standing there in the same position,

watching the truck as it backed in. To expedite unloading and for the accommodation of the driver plaintiff, over the years, had developed the practice of unlatching the rear door of the truck. Johnson, aware of the practice, had not objected or complained. Plaintiff testified that he would unlatch it *after the truck backed in flush with the bumper*. There is no evidence that Johnson knew when plaintiff would unlatch with reference to the time the truck touched the bumper or whether plaintiff unlatched before or after Johnson dismounted from the cab. Johnson would find it unlatched when he reached the back of the truck to unload. On this occasion, at the "instant" the truck touched the dock, i. e., within 2 or 3 seconds, plaintiff glanced down, noticed that the back of the truck was flush with the bumper and that the truck was motionless. Plaintiff then reached around to unlatch the chain gate of the truck. He had to reach out 1 or 2 feet to catch hold of the latch but was still able to retain his hold on the door handle behind him. The engine was still running. The truck was not moving. Plaintiff was in a slightly awkward position and was slightly off balance. In the 3½ years or more plaintiff had been employed there every time a truck came up and hit the bumper it would roll forward an inch or two but plaintiff had never seen a truck move forward more than 1 or 2 inches, and in so doing it would ease forward slightly, not suddenly. On this occasion plaintiff thought the truck might roll forward an inch or two but nothing like a foot or two. He did not think it would jerk away suddenly. Plaintiff did not wait for the truck to roll forward an inch or so, and did not wait for Johnson to turn off the engine, before reaching out and taking hold of the latch. In somewhat of a hurry, plaintiff tried to get the door open so the driver could "get done before the coffee break." He intended to get Johnson unloaded before the coffee break, if possible. About the time plaintiff took hold of the truck gate latch the truck suddenly jerked or lurched

forward 1 or 2 feet. As a consequence of the lurch and "an instant later" plaintiff let go of the handle of the dock door and was jerked off the dock and fell straight down to the pavement between the rear end of the truck and the dock bumper, landing a little to the right of the center of the truck. Plaintiff testified "Well, when the truck pulled away I went down." "It happened so fast it jerked me out of the doorway onto the ground." Plaintiff landed on the ground on his feet, yelled as loud as he could, and as soon as he hit the ground—"immediately"—in an instant —in a "split second"—plaintiff started moving to "get out"—attempting to get in the clear—but after the truck had rolled forward it instantly started to back up again. Immediately, at the same "second" plaintiff hit the ground, the truck started back again. Plaintiff did not know whether Johnson had time to shift gears. He did not hear anything that sounded like gears being shifted. Plaintiff was able to take 2 or 3 steps to the right edge of the back end of the truck before the truck caught him, pinning him between the truck and the brick wall of the dock, inflicting a crushing internal abdominal injury which required over three hours of surgery to save his life. Plaintiff's yell was not heard by the driver. Johnson testified that the motor did not make much noise. Plaintiff testified that the truck was making so much noise that Johnson probably could not have heard plaintiff. The driver could not see plaintiff reach for the truck door handle, and could not see him when he was pulled off the dock onto the pavement. The first time plaintiff would have been visible to the driver would have been at the moment plaintiff was crushed —at a time when plaintiff had already been caught—and only then if Johnson had been looking at the rear-vision mirror located on the right side of the cab.

On direct examination Johnson denied that the truck lurched or jerked forward, but he had previously testified that he did not know whether that happened; that

he did not recall that, but that "it is possible, it could have" hit the dock and then rolled away and then back and hit again; he could not remember. In answer to the question "But it could have?" Johnson answered "It could have. It is possible. * * * Well, everything is logic."

The petition made four assignments of primary negligence, plus humanitarian negligence. Plaintiff abandoned humanitarian negligence and two assignments of primary negligence and submitted the case on these two charges of primary negligence: failure "to keep a proper and vigilant lookout for persons in the vicinity including plaintiff," and backing his truck "at a time when he should in the exercise of ordinary care have known plaintiff was in a position of peril from such movement." Instruction No. 1 hypothesized knowledge by the driver that plaintiff was standing on the ledge when he started backing toward the dock; the backing of the truck against the ledge; the fact that plaintiff took hold of the truck latch to unlatch it; plaintiff's custom of unlatching the truck gates and driver's knowledge of the custom; the lurching or jerking forward of the truck 1 or 2 feet; the fact that plaintiff slipped or fell into a position of danger between truck and dock as a result of the lurch or jerk, and then directed a verdict for plaintiff if under these circumstances the driver "could and should in the exercise of ordinary care have foreseen the reasonable probability of danger to Donald Taylor and could in the exercise of ordinary care have discovered whether Donald Taylor was in a position of danger before again backing the truck (if so), but that the driver backed said truck toward the dock without making any effort to determine whether he was in the clear and without giving plaintiff an opportunity to reach a place of safety * * *."

Defendant's first point is that the court erred in failing to sustain defendant's motion for a directed verdict at the close of all the evidence. Defendant claims that there is no evidence that it was negligent in any respect.

The primary negligence charged and submitted is that of discoverable peril; not discovered peril, not negligence in backing the first time; not negligence in causing the truck, after contact with the dock, to lurch or jerk forward suddenly, but negligence after the truck jerked or lurched forward in failing to ascertain whether plaintiff was in danger, by (1) not calling out to plaintiff to inquire whether he was in the clear, or (2) not waiting "a while" before backing up the second time, or (3) not getting out of the cab and going back to check to see if plaintiff was in the clear. The foregoing seems evident, considering plaintiff's petition, evidence, Instruction No. 1 and plaintiff's final argument to the jury.

The decisive question is whether there was any legal duty upon the truck driver, under the peculiar circumstances of this case, to discover plaintiff's position of peril. By Instruction No. 1 the duty is based squarely upon foreseeability. Liability is predicated upon a finding that under the circumstances the truck driver, in the exercise of ordinary care, could and should have foreseen the reasonable probability of danger to plaintiff. "[N]egligence which imposes liability must result from a faulty or defective foresight. Negligence is predicated on what should have been anticipated, rather than what happened." McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S.W.2d 693, 697; Gruetzemacher v. Billings, Mo.Sup., 348 S.W.2d 952, 957 [3]. A finding of negligence is not to be based upon hindsight. Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 224 S.W.2d 989, 995, 16 A.L.R.2d 904; Dickinson v. Eden Theatre Co., 360 Mo. 941, 231 S.W.2d 609, 612. "Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same cir-

cumstances would or should, in the exercise of reasonable care, have anticipated." Shearman and Redfield on Negligence, § 24, p. 50. The duty of anticipation is not that of prescience; it is the duty of *reasonable anticipation* that harm or injury is a likely result of acts or omissions. Kettler v. Hampton, Mo.Sup., 365 S.W.2d 518, 522 [3]. "A person is not required to look for danger where he has no cause to anticipate it, or when the danger would not exist but for the negligence of another. Anderson v. Welty, Mo.App., 334 S.W.2d 132, 137–138 [8]; Williamson v. St. Louis Public Service Co., 363 Mo. 508, 252 S.W.2d 295, 299 [7]." White v. Burkeybile, Mo.Sup., 386 S.W.2d 418 (decided by Division No. Two, February 8, 1965). It is not negligence to fail to anticipate that another will be negligent for one is entitled to assume and act upon the assumption that others will exercise due care for their own safety, in the absence of notice to the contrary. Highfill v. Brown, Mo.Sup., 340 S.W.2d 656, 663. Huber v. Henry J. Kaiser Co., 71 Cal.App.2d 278, 162 P.2d 693, 698 [8].

■ This injury occurred on the private premises of plaintiff's employer, not on a public highway. For 3½ or 4 years plaintiff had been in daily contact with trucks and truckers bringing supplies to this dock. Plaintiff knew intimately the manner in which truck drivers entered the premises, maneuvered their turns and backed up to the docks, and their *modus operandi* generally. Plaintiff saw defendant's truck as Johnson drove into the premises with a cargo which plaintiff knew was to be unloaded at dock two. Plaintiff motioned and directed him to back into the dock, and stood on the dock in a safe place watching Johnson perform the backing operation. Johnson likewise saw plaintiff at the time Johnson drove into the area; saw plaintiff standing on the floor of the dock, in a safe position above and out of the area where the trucks maneuvered. Because there was no rear window in the truck and the rear-vision mirrors would not reveal objects immediately to the rear of the truck it was impossible for the driver to con-

tinuously observe plaintiff throughout the entire backing operation. Both he and plaintiff knew that neither would be able to see the other after the truck reached a point in the backing operation 15–20 feet short of the dock. In performing the backing operation it was customary for the driver to look at the left-hand rear-vision mirror and "line up" the course of the truck by reference to the door facing, an operation which required concentration of attention in order to guide the truck to a position directly in front of the door opening into the dock. Plaintiff was fully acquainted with all of the conditions, and was under a duty to look out for himself. The driver backed the truck in a normal manner, at a slow speed. There is no suggestion of lack of care during the first backing operation. In this situation the driver had the right to expect the area of pavement directly behind the truck, although not visible to him during the backing operation, to be free and clear of persons, in the absence of facts or circumstances putting him on notice otherwise; and the right to expect that plaintiff would take care for his own safety. His duty to plaintiff under these undisputed facts was not the statutory duty to exercise the highest degree of care, and he was not under a duty to keep a continuous lookout for plaintiff on the pavement. See Partney v. Agers, 238 Mo.App. 764, 187 S.W.2d 743, 750 [6]. From plaintiff's own testimony we know that throughout the course of the first backing operation, including the time after the driver lost sight of him, plaintiff was in a place of safety, out of harm's way, up on the floor of the dock. The driver reasonably could assume that plaintiff would stay there in a place of safety and could not reasonably be held to anticipate that plaintiff, either through plaintiff's negligence, or accident, or misadventure, would change his position from the safety of the dock to the perilous blind spot behind the slowly backing truck. There was no duty to protect plaintiff from the injury he sustained because the driver had no knowledge, actual or constructive, of the fact that plaintiff had fallen from the platform when the truck jerked forward. That forward

movement was the only untoward incident between the time the driver lost sight of plaintiff and the moment of plaintiff's injury—the only abnormal happening—and it is upon this single differentiating fact that plaintiff depends to supply the element of notice to the driver of the probability of danger to plaintiff and to impose upon him the duty to call out, wait, or get out of the cab and investigate the conditions behind the truck to determine whether plaintiff was in the clear before moving the truck backwards 1 or 2 feet to the dock. Reasonable minds could not conclude that this single fact was sufficient to alert the driver to this probability and impose upon him the duty to take the precautions suggested. While there is evidence that the driver was aware of and did not object to plaintiff's custom of opening the truck before the driver reached the rear of the truck to unload and must be held to have known that plaintiff used the latch to open the door, there is no evidence that the driver knew or from which he should be held to anticipate that plaintiff customarily or on this occasion took hold of the latch as soon as the truck reached the bumper, or that plaintiff would hurriedly reach out over the edge of the dock and attempt to open the latch while in an awkward, unbalanced position, at a time before the truck came to a final stop, or that the forward lurch or jerk would dislodge plaintiff from his place of safety and precipitate him to the pavement below. There is no other evidence from which the driver should have anticipated any conduct on plaintiff's part which might contribute to his falling into the 1 or 2-foot space. Nor was there any evidence that the driver was warned of plaintiff's danger by, or that he could or should have heard, plaintiff's yell as he fell. Plaintiff himself discounted the latter as a probability. The risk of plaintiff falling to the pavement during this short interval of time was so slight as to be inconsiderable as a practical matter. To hold defendant, through its driver, to anticipate such an unlikely and improbable occurrence would be to require of the driver a foreknowledge of events bordering upon prescience, and would

set a standard far above that imposed by law. "No man can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded." Prosser, Law of Torts, 3rd Ed., § 31, pp. 149, 150.

As indicated, plaintiff was concededly in a position of safety immediately before the accident. The evidence did not show that any act of defendant caused him to leave that position. Blue Ridge Mining Co. v. Dobson, Ky.App., 310 S.W.2d 52. Defendant's driver last saw him in a position of safety and was justified in assuming that plaintiff would stay there and that plaintiff was still safely out of harm's way when he reversed the truck the second time. A recovery may not be permitted to stand in this case, where the driver had no actual or constructive knowledge of plaintiff's perilous position and the evidence shows that defendant's driver "used all the care that could have been expected of an ordinarily prudent person." Pritchard v. Henry, Tex. Civ.App., 200 S.W.2d 651, 653.

In Giudice v. Delaware Sand & Gravel Co., D.C., 38 F.Supp. 90, a worker on a construction job, directing a truck driver to back towards the concrete mixer, while the truck was slowly backing, stepped into the path of the truck to remove a stone and was struck. The district court dismissed the complaint, holding that defendant's driver exercised ordinary care in proceeding as directed in the reasonable belief that plaintiff standing at the right rear of the truck would remain outside its backward path, and was guilty of no act causing injury to plaintiff. See also McCain v. Sieloff Packing Co., Mo.Sup., 246 S.W.2d 736; Oglesby v. Vonder Haar Concrete Co., Mo.Sup., 372 S.W.2d 876. In other factual situations where the risk of someone coming into a position of danger from the backward operation of a motor vehicle was relatively slight, and the truck driver was not aware of the plaintiff's presence in close quarters, recovery has been denied on the theory that

the truck driver was entitled to proceed upon the assumption that others in the vicinity would exercise proper care for their own safety. Winsor v. Smart's Auto Freight Co., 25 Wash.2d 383, 171 P.2d 251; Gloshinsky v. Bergen Milk Transp. Co., 279 N.Y. 54, 17 N.E.2d 766; Nelson v. Mitten, 218 Iowa 914, 255 N.W. 662.

Since defendant's driver, in the exercise of ordinary care, had no duty under the circumstances of this case to anticipate the reasonable probability of danger to plaintiff, defendant's motion for a directed verdict should have been sustained. The judgment for plaintiff therefore must be reversed. It is so ordered.

WELBORN, C., concurs.

HIGGINS, C., not participating.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.