**Viviane HOSTO, Russell Hughes, Brooke A. Arbeitman, and Christopher M. Arbeitman, Respondents,**

v.

**UNION ELECTRIC COMPANY, Appellant.**

No. ED 74975.

Missouri Court of Appeals,
Eastern District,
Division One.

May 9, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 13, 2001.

Application for Transfer Denied
Aug. 21, 2001.

**136**

Armstrong Teasdale LLP, James J. Virtel, Ann E. Buckley, Lisa M. Wood, One Metropolitan Square, St. Louis, MO, for appellant.

Davidson, Schlueter, Mandel & Mandel, Alan S. Mandel, St. Louis, MO, for respondents, Viviane Hosto, Russell Hughes.

Michael A. Wolff, Charles A. Seigel, III, Seigel & Wolff, P.C., St. Louis, for Respondents Brooke and Christopher Arbeitman.

GARY M. GAERTNER, Sr., Presiding Judge.

Appellant, Union Electric Company ("Union Electric"), appeals from the judgment of the Circuit Court of the City of St. Louis, entered in favor of the respondents, Viviane Hosto, Russell Hughes, and Brook and Christopher Arbeitman ("Respondents"), after the jury returned a verdict in the amount of $ 2,500,000 for Viviane Hosto and Russell Hughes and $1,250,000 for Brooke and Christopher Arbeitman in an action for negligence. We affirm.

The evidence presented in this case most favorable to the verdict is as follows.[1] Early in the evening of August 9th, 1992, Harold Arbeitman ("Arbeitman") and Evelyne Hughes ("Hughes") arrived at the Duck Club restaurant on the Illinois shore of the Mississippi River. Arbeitman owned a helicopter, which he flew to and from the Duck Club regularly. Shortly after they arrived, a boater came to the restaurant looking for Arbeitman and spoke with the manager of the restaurant. The boater asked the manager to tell Arbeitman there had been a boating accident on the river in which a man was seriously injured; and a helicopter was needed to transport the victim to the nearest hospital. The manager relayed the message to Arbeitman. He immediately got up from the table and with Hughes as his passenger, he left in his helicopter to attempt a rescue.

After taking off, they climbed to approximately 500 feet above the river and flew about two miles north from the Duck Club. Another boater on the river heard on the radio that Arbeitman was in flight but was heading in the opposite direction from the injured man. The boater spotted Arbeitman and started waving a towel in the air to get his attention. Arbeitman turned the helicopter around toward the south and descended to the height of 50 to 100 feet off the water to hover over the boat. The boater through motions informed Arbeitman the injured man was down the river in the opposite direction from his flight. Facing south, Arbeitman gained altitude and slowly moved down the river.

---

1. *See, Kimbrough v. J.R.J. Real Estate Investments, Inc.,* 932 S.W.2d 888, 889 (Mo.App. E.D.1996).

The injured man was near Royal Island around mile marker 223[2]. This portion of the Mississippi River has several islands and is a popular gathering place for boaters. People park their boats, congregate on the beaches, operate jet skis, and swim in the area. Union Electric maintains power lines in this area about half a mile south of mile marker 225 that stretch 2,300 feet across the Mississippi river. The lines crossing the river are supported by three sets of towers: two on the Illinois bank of the river, two on Iowa Island, and two on the Missouri bank of the river. People along the river use these power lines as a reference point, and the area below them is often designated as a meeting or gathering place. As many as 10,000 boaters will pass under these power lines on an average summer weekend.

A witness standing on the shore of one of the islands about ten feet from the power lines observed the helicopter flying slowly at a very low altitude, "obviously looking for something." The helicopter then approached the power lines spanning 1,300 feet between Illinois and Iowa Island, turned left suddenly, appearing to maneuver to avoid the power lines. The helicopter avoided the lower, larger conducting lines (three-fourths of an inch), but struck the smaller (five-eighths of an inch) static line with the rotor shaft of the helicopter. The helicopter became entangled with the wire, which snapped off the rotor blades of the helicopter. The helicopter plunged into the river, sinking immediately. The autopsy subsequently revealed Arbeitman was crushed by the helicopter, and Hughes drowned. The toxicology report revealed Arbeitman's blood alcohol content was .114 at the time of the accident.

Respondents, family members of the decedents, filed an action against Union Electric for wrongful death. Respondents allege Union Electric was negligent for failing to mark the power lines with orange marker balls. Union Electric claimed they owed no duty to decedents to mark the lines.

None of the lines was marked with orange balls. The Federal Aviation Administration (FAA) requires all power lines 500 feet above ground to be marked. 14 C.F.R. sec. 77.23(a)(1) (2000). Structures over 200 feet above ground are considered obstacles to air navigation if they are within three nautical miles of an airport whose longest runway is more than 3,200 feet, and may be required to be marked. *Id.* sec. 77.23(a)(2). These wires were 105 feet above the surface.

At trial, an employee for Union Electric, whose responsibilities included deciding whether existing power lines presented a hazard and should be marked, conceded that since these power lines were erected in 1913, Union Electric had never modified these lines, nor "gone out to determine whether those power lines should be marked." Since 1913, two airports have been constructed within a five-mile radius of the power lines, and over forty airports are in the general area. A number of witnesses testified there was frequent air travel by small aircraft along the river. The planes would fly in the vicinity of the power lines and "buzz" the boats. They also testified they frequently saw Arbeitman flying his helicopter along the river. Aside from the boating and air traffic, this area on the river was described as remote with limited road access and no hospital nearby.

The respondents presented an expert witness, Dr. Hynes, who was an experienced pilot, aviation instructor, FAA-desig-

2. *The mile markers decrease numerically travelling south on the Mississippi.*

nated examiner, and a consultant to electric companies on the issue of whether to mark power lines. Dr. Hynes testified he had examined the power lines at issue in this lawsuit and had formed the opinion that, regardless of the fact there had never been an accident involving these power lines since their erection, they posed a hazard to aviation activity and should have been marked.[3] He explained the small diameter of the power lines, the age of the lines, the oxidation of the lines leaving them a greenish gray color, the long span between the towers (1,300 feet), the fact the towers "do not jump out at you"—one being on a hill and the other in a "bunch of trees," the high level of boating activity on the river, and the high level of aviation activity in the area, were all factors he took into consideration to form his opinion. He described the Mississippi River as a "natural flyway" and explained that pilots use the river to navigate. Further, he explained with the substantial amount of boating activity on this section of the river, a high volume of planes are attracted to the area.

Dr. Hynes also testified that when he flew over the area to view the lines from a helicopter, being trained to look for electric lines, he found "[t]hey're virtually impossible to see. The static lines [were] impossible to see." He noted that as a result of the towers being set back in the trees, the lines were virtually impossible to see from a pilot's perspective, even by a trained expert. Further, he described the importance of the marker balls was not only to draw a pilot's attention to the wires while navigating; but that the marker balls aid in depth perception when a pilot is navigating in close proximity to the wires. A pilot can draw his sole attention

away from the wires while, for example, looking at the control panel, yet maintain in his vision these marker balls and therefore, at all times be aware of the proximity of the wires.

There were also several photographs of the electrical lines and towers from different angles exhibited by both parties and videotape. Several witnesses testified when viewing the exhibits the lines were difficult to see if not impossible in some instances.

The jury awarded $2.5 million to Brooke and Christopher Arbeitman, the children of Arbeitman, assessing fifty percent fault to Union Electric and fifty percent fault to Arbeitman. Accordingly, the trial court entered judgment for the Arbeitmans in the amount of $ 1.25 million. The jury awarded $ 2.5 million to Viviane Hosto and Russell Hughes, the parents of Hughes, and the court entered judgment for $ 2,133,500, after crediting their settlement with Arbeitman's estate.

Union Electric raises five points on appeal. Further facts pertinent to address these issues will be added as necessary.

In the first point, Union Electric appeals from the trial court's denial of their motion for judgment notwithstanding the verdict, alleging they were under no duty to mark the power lines, and therefore, the respondents failed to make a submissible case of negligence.

A motion for judgment n.o.v. presents the same issue as a motion for directed verdict at the close of all of the evidence: whether plaintiff made a submissible case ... To determine whether a plaintiff has made a submissible case, we view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. We

---

**3.** The expert stated as a consultant for power companies, he does not always recommend the power lines should be marked.

will not overturn a jury verdict unless there is a complete absence of probative facts to support it.

*Kimbrough v. J.R.J. Real Estate Investments, Inc.,* 932 S.W.2d 888, 889 (Mo.App. E.D.1996) (citation omitted).

 "Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." *Gibson v. Brewer,* 952 S.W.2d 239, 246 (Mo.1997) (citation omitted). In order for a plaintiff to make a submissible case of negligence, he must establish there was a duty, and the breach of that duty was the proximate cause of his injury. *Martin v. City of Washington,* 848 S.W.2d 487, 493 (Mo.banc 1993). "Whether duty exists is purely a question of law." *Lopez v. Three Rivers Electric Cooperative, Inc.,* 26 S.W.3d 151, 155 (Mo.banc 2000). "In the absence of a particular relationship recognized by law to create a duty, the concept of foreseeability is paramount in determining whether a duty exists." *Id.* Foreseeability is "the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." *Id.* "The judicial determination of the existence of duty rest on sound public policy." *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.* 700 S.W.2d 426, 431 (Mo. banc 1985). "In considering whether a duty exists in a particular case, court[s] must weigh the foreseeability of injury, likelihood of injury, magnitude of burden of guarding against it and consequences of placing that burden on defendant." *Lockwood v. Jackson County, Mo.,* 951 S.W.2d 354 (Mo.App. W.D.1997).

In *Lopez v. Three Rivers Electric Cooperative, Inc.,* the Supreme Court of Missouri addressed the issue of whether a utility company was under the duty to mark overhead wires. In that case, a helicopter flew into power lines stretched over the Osage River at an altitude of approximately 100 feet. *Id.* at 155. The helicopter crashed killing all four crewmembers. The following are additional facts the court relied on to find there was a duty to mark the power lines:

> The power lines at the accident site crossed a 939 foot span over the Osage River. They were suspended at an angle across the river between two "H" structures. Trees and other vegetation obstructed the view of the supporting structures. The power lines were three-eighths of an inch in diameter ... the lines had turned greenish brown in color ... the lines were not in close proximity to a public airport ... [there was] a similar incident that had occurred [nineteen years earlier] ... resulting in three fatalities ...

26 S.W.3d 151, 155 (Mo. banc 2000).

 The case at hand presents facts similar to those relied on by the *Lopez* court to find the accident was foreseeable and a duty existed. In this case, there was testimony the lines spanned 1,300 feet across the river. The lines had oxidized leaving them a greenish gray color. Dr. Hynes testified that when he viewed the towers from a helicopter they did not jump out at you—one being on a hill and the other in "a bunch of trees." Dr. Hynes also testified as a result of the towers being set back in the trees, the lines were virtually impossible to see from a pilot's perspective, even by a trained expert.

Union Electric argues that during cross-examination Dr. Hynes contradicted his previous testimony on the tower's visibility and therefore, no evidence of probative force exist. The excerpt of Dr. Hynes testimony cited by Union Electric, was elicited when Dr. Hynes was viewing and commenting on his perception of a photograph. Dr. Hynes was unable to testify as to whether this exhibit was taken from the

ground with an elevated camera, a helicopter, or an airplane. Also, in this excerpt, the questions posed were stated generally. For example, the question, "and what do towers *like this* tell you" (emphasis added) attempts to elicit Dr. Hynes's general opinion about utility towers, and not his perception of the towers at issue in this case when he viewed them from a helicopter. These statements on cross-examination do not vitiate his earlier testimony. Reading the testimony of Dr. Hynes as a whole, we do not believe his testimony is ambiguous or contradictory. While the testimony of other witnesses may conflict with Dr. Hynes's testimony, when reviewing the evidence in the light most favorable to the verdict, we believe there is probative evidence indicating that the towers were not clearly visible.

Although the Court in *Lopez* consulted other jurisdiction's jurisprudence dealing with power line collision cases, they refrained from adopting the three-part test set out in *Lively, infra,* employed by the dissent. Nor did the Court state the factors present in *Lopez* were the exclusive factors to consider when determining whether a duty exists to mark power lines. A fair reading of *Lopez,* would suggest the question of duty in power line collision cases is still determined by looking at all the relevant facts present in a particular case.

The one fact missing in this case that was present in *Lopez* is the existence of a similar prior accident with the loss of lives. Union Electric maintains presence of a prior similar accident is important, because then the utility companies would be on notice, and it goes to the foreseeability of another accident. We believe it would be a tragedy in Missouri jurisprudence to

say utility companies in this situation get one "free bite" before their duty to act against an unreasonable, foreseeable risk would arise.

This case presents additional, significant factors when considering whether there is a duty to mark the power lines. These power lines were in the close proximity to two airports and over forty airports were in the general area. Dr. Hynes testified that the Mississippi River serves as a "natural flyway," and pilots use the river to navigate. Several witnesses testified there was frequent air travel by small aircraft along the river. The planes would fly in the vicinity of the power lines at low altitudes and "buzz" the boats. Also, many witnesses testified they frequently saw Arbeitman fly his helicopter along the river.[4]

Dr. Hynes described the wires as "virtually impossible to see." When viewing the several photographs of the power lines exhibited by both parties, several witnesses testified the lines were difficult to see, if not impossible, in some instances. These power lines were located above a popular gathering place for boaters and swimmers. As many as 10,000 boaters pass under these power lines on an average summer weekend. We believe, as the trial judge found, it was foreseeable that a boater would be injured in the area below the lines and would need emergency assistance. Since there is limited access by road and no hospital in the area, it was foreseeable an air rescue would be necessary.

Had it been necessary for an emergency rescue of one of the 10,000 boaters by helicopter below these power lines, according to expert testimony, the marking of the power lines would have served two

---

4. *See, Davis v. Cessna Aircraft Corp.,* 182 Ariz. 26, 893 P.2d 26, 30 (App.1994) (court noted their courts have held if helicopters are "known to operate in a particular area, the owner may be required to mark power lines in that area to make them reasonably safe." ).

cautionary functions. First, it alerts the pilot to the existence of the power lines from a distance. Second, when flying in a close proximity to the lines, the markers aid the pilot in gauging how close he is to the wires. This information is particularly significant to the case at hand, since Arbeitman was required in his rescue to maneuver his helicopter in close proximity to the power lines, and missed the larger conducting lines, but came into contact with the smaller static lines.

We believe, on these particular, unique facts, an accident involving an aircraft and these power lines was foreseeable, and therefore, Union Electric was under a duty to mark the power lines. Union Electric should have been aware with the exercise of reasonable diligence that these power lines presented a risk to aviators. We conclude the trial court did not err in denying Union Electric's motion for judgment notwithstanding the verdict.

In its second point on appeal, Union Electric alleges the trial court erred in giving instructions number 8 and 13, respondents' verdict-directing instructions, alleging the instructions erroneously assumed facts, were misleading, vague, and amounted to a roving commission. The following instructions were submitted to the jury over Union Electric's objections:

### Instruction 8

In your verdict you must assess a percentage of fault to defendant whether or not Harold Arbeitman was partly at fault if you believe:

First, plaintiffs Brooke and Christopher Arbeitman were the children of Harold Arbeitman, and

Second, defendant maintained power lines over the Mississippi River in the vicinity of mile marker 225 without marker balls to warn pilots of their presence and as a result the airspace in the vicinity of the power lines was not reasonably safe for persons flying aircraft in that area, and

Third, defendant knew or by using ordinary care could have known of this condition, and

Fourth, defendant failed to use ordinary care to warn of the condition, and

Fifth, such failure directly caused or directly contributed to cause Harold Arbeitman's death.

### Instruction 13

Your verdict must be for the plaintiffs Viviane Hosto and Russell Hughes if you believe:

First, plaintiffs Viviane Hosto and Russell Hughes were the natural parents of Evelyne Hughes, and

Second, defendant maintained power lines over the Mississippi River in the vicinity of mile marker 225 without marker balls to warn pilots of their presence and as a result the airspace in the vicinity of the power lines was not reasonably safe for persons flying aircraft in that area, and

Third, defendant knew of, or by using ordinary care could have known of this condition, and

Fourth, defendant failed to use ordinary care to warn of the condition, and

Fifth, such failure either directly caused the death of Evelyne Hughes or combined with the acts of Harold Arbeitman to directly cause the death of Evelyne Hughes.

Instructions 8 and 13 were derived from an instruction approved in *Pierce v. Platte-Clay Elec. Coop.,* 769 S.W.2d 769, 777 (Mo. banc 1989). In *Pierce,* a farmer filed a negligence action against an electric company for damages he suffered when his tractor snapped an unmarked guy wire

that stabilized a pole which supported the electric company's power lines. *Id.* The farmer's theory of liability was based on the electric company's negligent failure to mark the guy wire to warn farmers of the wire's presence. The verdict-directing instruction in *Pierce* read as follows:

In your verdict you must assess a percentage of fault to Defendant if you believe:

First, Defendant maintained a guy wire near the northeast corner of a cultivated field on the Kurtenbach farm property in support of a utility pole with attached cable crossing over "HH" Highway, and

Second, such guy wire was not equipped with a guard or marker and as a result persons operating farm machinery on the Kurtenbach farm property were exposed to an unreasonable risk of running the machinery into the guy wire and being injured, and

Third, Defendant knew or by the exercise of ordinary care should have known of the existence of this condition and such unreasonable risk, and

Fourth, Defendant failed to use ordinary care to remedy it, and

Fifth, such failure directly caused or directly contributed to cause injury to Plaintiff.

This instruction is a modified version of MAI 22.03.

▮▮ Whether or not a jury was properly instructed is a question of law. *Luyties Pharmacal Co. v. Frederic Co., Inc.,* 716 S.W.2d 831, 834 (Mo.App. E.D. 1986). If a Missouri Approved Instruction is applicable to a particular case, its use is mandatory. Rule 70.02(b). However, if there is no Missouri Approved Instruction that is applicable, the court must adopt an instruction that follows the substantive law and can be readily understood by the jury. *Murphy v. City of Springfield,* 794 S.W.2d

275, 278 (Mo.App. S.D.1990). "[A] modified MAI or not-in-MAI instruction should require a finding of all ultimate facts necessary to sustain a verdict." *Grindstaff v. Tygett,* 655 S.W.2d 70, 73 (Mo.App. E.D. 1983).

▮▮ Specifically, Union Electric argues these instructions erroneously assumed facts and required the jury to find it knew of some unspecified "condition." First, addressing the latter concern, paragraph three of the instruction cannot be read apart from the preceding paragraphs of the instruction. *See, Pierce* at 778. Reading the instruction as a whole, it is clear the "condition" referred to in paragraph three is referring to the hypothetical laid out in the preceding paragraph. Specifically, the jury was asked to determine whether Union Electric knew, or by using ordinary care, could have known the airspace in the vicinity of the power lines was not reasonably safe, because there was a foreseeable risk to aviators flying in the area of the power lines by maintaining power lines over the Mississippi River in the vicinity of mile marker 225 without marker balls to warn pilots.

▮▮ Second, Union Electric argues instruction 8 and 13 erroneously assumed that persons had flown aircraft "in the vicinity of the power lines," and it knew or should have known of such flights. Further, Union Electric argues these instructions failed to submit the essential issue of whether it reasonably should have foreseen that aircraft would be flying in the vicinity of the power lines. An instruction must only submit the ultimate facts necessary to sustain a verdict. As discussed above, the concept of foreseeability is paramount in determining whether a duty exists. Although, "[i]n some cases, the jury may be charged with determining whether facts exist that may give rise to a finding

of foreseeability ... it is for the court to determine as a matter of law whether the facts give rise to a duty." *Lopez* at 157 n. 1. Therefore, it was within the trial court's province to determine foreseeability of injury and not submit the issue to the jury in a verdict-directing instruction. Therefore, the trial court did not err in submitting instructions number 8 and 13 to the jury.

In its third point, Union Electric alleges the trial court erred in excluding evidence of Evelyne Hughes's blood alcohol content and refusing to submit to the jury an instruction alleging her comparative fault.

Union Electric alleges that Hughes spent the whole day with Arbeitman. Arbeitman's blood alcohol level was .114 at the time of the accident; indicating he either had five to six drinks in the hour immediately preceding the accident or an additional one to two drinks each hour preceding the accident. Union Electric argues these facts were sufficient to support the submission of a jury instruction of Hughes's comparative fault. It argues, a jury could have reasonably inferred Hughes was negligent in entering a helicopter with a pilot whom she knew was in an intoxicated condition. We disagree.

 "It is a well settled rule of law that any issue submitted to the jury in an instruction must be supported by evidence from which the jury could reasonably find such issue." *King v. Unidynamics Corp.,* 943 S.W.2d 262, 267 (Mo.App. E.D.1997). It is erroneous for the trial court to give an instruction where there is no substantial evidence to support the issue submitted. *Id.* "In considering whether or not an instruction is supported by evidence, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the party offering the instruction." *Id.*

In the case at bar, reviewing the record in a light most favorable to Union Elec-

tric's instruction, we find no substantial evidence to support the submission of the instruction. There was no testimony in the record that Hughes had consumed any alcohol with Arbeitman. Union Electric's speculation that she may have spent the day with Arbeitman and may have witnessed him drinking is not substantial evidence to warrant the submission of comparative fault instruction to the jury.

 Furthermore, Union Electric argues that the trial court erred in excluding the evidence of Hughes's blood alcohol content. Union Electric contends the evidence is relevant and would have further supported the submission of her comparative fault instruction to the jury, in that it supported an inference that she and Arbeitman had been drinking together and was additional evidence of her knowledge of his impaired condition. Union Electric relies on *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104 (Mo.banc 1996).

In *Rodriguez,* the defendant, Suzuki, contended that the trial court erred in excluding evidence of passenger/plaintiff Rodriguez's alcohol consumption on the issue of her negligence. *Id.* at 109. In their answer to Rodriguez's petition and by its offer of proof, Suzuki asserted the affirmative defense of comparative negligence by "plaintiff's decision to and act of traveling in a vehicle operated by an intoxicated driver." *Id.* Suzuki did not allege Rodriguez's intoxication as an independent act of negligence, but it argued that her drinking impacted her decision to enter and remain in the vehicle with an intoxicated driver. *Id.*

The Supreme Court stated that Suzuki was entitled to submit Rodriguez's comparative negligence to the jury if it met its burden of production. *Id.* The Court noted that Rodriguez admitted consuming alcohol with the intoxicated driver before

entering the vehicle, and her alcohol content was about .11 at the time of the accident (compared to the .10 prima facie level of legal intoxication). *Id.* Thus, the Court held that Suzuki was entitled to submit the comparative fault instruction because it met the burden of production. *Id.*

Here, the record is devoid of any evidence Hughes consumed alcohol the day of the accident with Arbeitman. Her blood alcohol content was approximately .08 at the time of her death (compared to the .10 prima facie level of legal intoxication). We conclude Union Electric was not entitled to submit the comparative fault instruction. Further, the trial court did not err in excluding the evidence of Hughes's blood alcohol content, because Union Electric did not meet its burden of production.

In its fourth point on appeal, Union Electric alleges the trial court erred in denying its motion for remittitur as to Brooke and Christopher Arbeitman.

■■■ The trial court has broad discretion in ordering remittitur, and its decision whether or not to reduce damages will not be disturbed on appeal absent an abuse of discretion "so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268 (Mo.App. E.D.1997). Missouri statute provides in a wrongful death action a jury may take into consideration the pecuniary losses suffered by reason of death and loss of companionship, comfort, instruction, guidance, among other things. Mo.Rev. Stat. sec. 537.190 (1994).

■■■ Harold Arbeitman died at the age of forty-seven. At the time of his death, his two children were ages 16 and 20. Arbeitman was divorced from the mother of the children, but continued to provide financial support to the children and his ex-wife above what was required by court order. In a suit for wrongful death, we do not believe damages of $2.5 million less $1,250,000 for comparative fault, are excessive. Therefore, we find the trial court and jury did not abuse their discretion. Point denied.

■■■ In its fifth point on appeal, Union Electric alleges the trial court erred in denying its motion for remittitur as to Viviane Hosto and Russell Hughes. Again, it is difficult to put a dollar value on life. There was evidence in the record Viviane Hosto and Russell Hughes had a loving relationship with their daughter, who died at the age of twenty-seven. We find the trial court and jury did not abuse their discretion in awarding damages of $2,500,000. Point denied.

Based on the foregoing, we affirm the judgment of the trial court.

SIMONS, J., concurs.

JAMES R. DOWD, J., dissents in a separate opinion.

JAMES R. DOWD, Judge, dissenting.

I respectfully dissent.

I agree that Union Electric has a duty to give notice of its power lines to pilots in a manner that makes them reasonably safe. I do not, however, believe that a pilot with a blood alcohol level of .114 striking these power lines is foreseeable [1]

---

1. An intoxicated pilot is not foreseeable in the same way as an intoxicated driver of a motor vehicle. The roads are lined with restaurants and other establishments that sell liquor. We all know that a significant number of their patrons will drive home after drinking. A certain level of drinking and driving is thus foreseeable. This is decidedly not so in the case of pilots. The law does not tolerate any level of intoxication in pilots. FAA regula-

or that there was evidence presented at trial sufficient for us to conclude that these lines were unreasonably dangerous to normally flying aircraft. The majority here expands the duty to give notice by attaching marker balls to power lines well beyond what was previously required by state and federal law.

I agree with the majority's statement of the general principles of law governing the determination of when a duty to take precautions exists. But I think it appropriate to emphasize Dean Prosser's admonition that "duty is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; *and it must be determined only by the court.*" PROSSER AND KEETON ON THE LAW OF TORTS at 236 (5th ed.1984) (emphasis added). This judicial determination of the existence of a duty

> rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community . . .

*Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 432 (Mo.1985) (quotation and citations omitted). The grim calculation of factors is made all the more difficult in this

case because Mr. Arbeitman was clearly acting as a "good samaritan" at the time of this tragic accident. Still, it remains the court's duty to weigh and balance these factors. The concept of comparative fault, upon which this case was submitted to the jury, offers us no solace because that issue is not reached until we determine that a duty exists.

Here, there is no statutory duty to place marker balls on these wires because the wires are only 105 feet above the ground,[2] so we look to the case law to determine whether there is a duty to attach marker balls to these wires.

*Lopez v. Three Rivers Electric Cooperative, Inc.*, 26 S.W.3d 151 (Mo. banc 2000), cited by the majority, is the only Missouri case to address the duty to attach marker balls to power lines. In that case, the Supreme Court concluded that though the power company complied with FAA regulations, it had a duty to attach marker balls to its lines because of a prior wire strike and because the towers were hidden by trees and the wires blended in with the surrounding landscape. *Id.* at 157.

The *Lopez* court cites *Poelstra v. Basin Electric Cooperative*, 545 N.W.2d 823, 827 (S.D.1996), which employed a similar approach to determine when power lines must be marked. *Lopez*, 26 S.W.3d at 156. In *Poelstra* the Supreme Court of South Dakota adopted the following standard:

> no duty or breach of duty exists as a matter of law where the following elements exist: the height of the power

tions strictly prohibit persons from *acting or attempting to act as a crewmember of a civil aircraft within 8 hours of consuming any alcoholic beverage.* 14 C.F.R. § 91.17. It strikes me as inappropriate to require power companies to take precautions against an intoxicated pilot.

**2.** Wires above 500 feet must be marked. 14 C.F.R. § 77.23(a)(1) (2000). Structures over 200 feet above ground are considered obstacles to air navigation if they are within three nautical miles of an airport whose longest runway is more than 3,200 feet, and *may* be required to be marked. *Id.* § 77.23(a)(2) (emphasis added).

lines and their location are in compliance with applicable ordinances and FAA regulations; no notice of prior accidents of a similar kind involving the power lines exist; and the power lines, as constructed, do not create an unreasonable risk of harm.

*Id.* at 827 (quoting *Florida Power & Light Co. v. Lively,* 465 So.2d 1270, 1274 (Fla.Ct. App.1985), *review denied,* 476 So.2d 674 (Fla.1985)).[3]

The *Lopez* court also cites *Davis v. Cessna Aircraft Corp.,* 182 Ariz. 26, 893 P.2d 26, 31, 33 (App.1994), which emphasizes that before a duty to attach marker balls will arise the wires in question must constitute an *unreasonable* risk of harm. *Lopez,* 26 S.W.3d at 156. In *Davis,* an airplane collided with unmarked power lines while allegedly attempting an emergency landing on an interstate highway, killing all four persons in the plane. Survivors of the decedents sued the Arizona Public Service Company (APS) for negligently failing to mark the lines so that they were visible to aircraft. *Davis,* 893 P.2d at 29. The trial court concluded that APS owed no duty of care to the decedents and granted summary judgment in favor of APS. The Arizona Court of Appeals held that "failure to mark its power lines did not create an unreasonable risk of harm *to normally operating aircraft* and therefore, APS did not breach its duty to decedents to guard against the risk of unreasonable harm ..." *Id.* at 29, 893 P.2d 26 (emphasis added); *see also Lea v. Baumann Surgical Supplies,* 321 So.2d 844, 855 (La.Ct.App.1975). The record here is uncontroverted that Arbeitman failed to comply with the most basic rules of safe flying, and that the power lines did not pose an unreasonable risk of harm to normally operating aircraft.

First, as *Davis* makes clear, the duty to affix marker balls to lines arises when the wires pose an *unreasonable risk to normally operating aircraft. Davis,* 893 P.2d at 29, 32. "A person responsible for a dangerous condition that is likely to cause injury to persons *rightfully* in its proximity is charged with taking appropriate precautions to avoid injury to such persons, and his failure to take such precautions constitutes negligence." *Zuber v. Clarkson Const. Co.,* 363 Mo. 352, 251 S.W.2d 52, 55 (banc 1952) (emphasis added). There is no duty to take precautionary measures to prevent injuries that result from "peculiar, unusual and unexpected occurrences" that could not have been reasonably anticipated. *Id.* In the absence of notice to the contrary, persons are entitled to assume that others will exercise due care for their own safety. *Taylor v. Dale Freeman Corp.,* 389 S.W.2d 57, 61 (Mo. 1965).

Those who possess structures that may be obstacles to navigation can expect that pilots will observe certain minimal levels of conduct. *Davis,* 893 P.2d at 32. Among these are that pilots will not be intoxicated. A helicopter operated by an individual with Arbeitman's blood alcohol content, flying at so low an altitude two miles from any emergency and more than three nautical miles from an airport, is not a normally operating aircraft. It is more akin to the pilot in *Davis* attempting to land on an interstate highway.

Second, in every case where a court has found a duty to mark power lines one or more of the following were present: (1) prior wire strikes or actual notice of dan-

---

**3.** *See also, Baine v. Oklahoma Gas and Elec. Co.,* 850 P.2d 346 (Okla.Ct.App.1992), adopt- ing the same standard.

ger,[4] (2) support towers above the 200 foot floor established by FAA regulation,[5] (3) obscured support towers,[6] and (4) configurations of support towers which could fool a pilot because they result in lines hanging from one set of towers that are actually *above* another set of support towers.[7] None of these facts exist here. The power lines here have traversed this span of river without incident since 1913. They comply with all state and federal regulations.

In finding the existence of a duty the majority relies on testimony from plaintiff's expert witness to establish that the towers here, like those in *Lopez*, provide insufficient warning to pilots of the wires hanging between them. Although "expert testimony might be relevant to help establish some underlying fact on which duty may ultimately rest, whether a duty exists is not a question for expert testimony, but one for the trial court based on the facts viewed in a light most favorable to the plaintiff." *Burns v. Black & Veatch Architects, Inc.*, 854 S.W.2d 450, 453 (Mo.App. 1993). I do not believe plaintiffs' expert provided evidence sufficient to allow us to conclude that these lines pose an unreasonable risk of danger because the towers here are remarkably different from the towers described in *Lopez*.

Plaintiffs' expert admitted that one of the most fundamental rules of safe flying is to fly above the towers that support power lines. *See also Baumann Surgical Supplies*, 321 So.2d at 850; *Shute v. Moon Lake Elec. Ass'n*, 899 F.2d 999, 1002 (10th Cir.1990). If the towers are clearly visible, a pilot obeying the simplest rules of safe flying is warned of the presence of the wires and knows that he must stay above the towers to be safe. Central, therefore, to the determination that power lines pose an unreasonable risk of danger is whether the support towers provide sufficient notice of the wires between them. This point was emphasized in *Lopez*. *Lopez*, 26 S.W.3d at 157. Testimony in *Lopez* established that "the supporting structures, located on the banks of the river, were *not visible* from a distance of one mile in either direction *and were obstructed.*" *Id.* at 157 (emphasis added). Here the evidence, viewed in the light most favorable to the verdict, does not support a finding that the towers are "not visible," "obstructed," or even difficult to see.

The only evidence in the record to suggest that the Union Electric's towers are not clearly visible is the testimony of plaintiff's expert, who on direct examination testified that:

> The span is about 1,300 feet, if I recall correctly, between the towers which is a fairly long span so you don't see the towers *to catch your attention.* The towers themselves, one of them is kind of up on a hill and the other is in a bunch of trees so that they don't *jump out at you to kind of warn you* that there is something coming up.

---

4. *Yoffee v. Pennsylvania*, 385 Pa. 520, 123 A.2d 636 (1956); *El Paso Natural Gas Co. v. United States*, 343 F.2d 145 (9th Cir.1965); *Bailey v. Pennsylvania Electric Co.*, 409 Pa.Super. 374, 598 A.2d 41, 46 (1991); *Lopez v. Three Rivers Electric Cooperative, Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000).

5. *United States v. Washington*, 351 F.2d 913 (9th Cir.1965); *Yoffee v. Pennsylvania*, 385 Pa. 520, 123 A.2d 636 (1956).

6. *Yoffee v. Pennsylvania*, 385 Pa. 520, 123 A.2d 636 (1956); *El Paso Natural Gas Co. v. United States*, 343 F.2d 145 (9th Cir.1965); *Arizona Public Service Company v. Brittain*, 107 Ariz. 278, 486 P.2d 176 (1971); *Bailey v. Pennsylvania Electric Co.*, 409 Pa.Super. 374, 598 A.2d 41, 46 (1991); *Lopez v. Three Rivers Electric Cooperative, Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000).

7. *Shute v. Moon Lake Elec. Ass'n*, 899 F.2d 999 (10th Cir.1990).

(emphasis added). Plaintiffs' expert does not testify that the towers are "not clearly visible." He does not testify that the towers are in any way "hidden" or "obscured." He does not testify that a reasonably attentive pilot would not see the towers. He states only that "you don't see the towers *to catch your attention*" and "they don't *jump out at you.*" (emphasis added). Any suggestion that the real meaning of this testimony is that the towers are "not visible" or "hidden" or "obscured" is defeated by the testimony of plaintiffs' own witnesses.

There is undisputed testimony that the towers on Iowa Island stand 170 feet above the ground. Plaintiffs' expert testified on direct that the trees on the island are between 50 and 100 feet tall. These towers, then, are *at least 70 feet taller than the surrounding trees.* Emily Kotraba, a witness called by plaintiffs, testified on cross-examination that the towers on Iowa Island are "substantially above the trees" and that their silver color "contrasts" with the color of the surrounding foliage. There is also undisputed evidence that the towers in Illinois are on a hill, stand 90 feet above the ground on that hill and are *not* surrounded by trees. These towers are so conspicuous a feature of the landscape that boaters use them as a reference point and meeting place.

During cross-examination, the following testimony was elicited from plaintiffs' expert:

Q Now, are towers like this something that you as a pilot would be aware of when you fly?

A Yes.

Q Okay, and what do towers like this tell you?

A That there is utility lines on the tower someplace.

Q They not only serve to support the utility lines but they're pretty large

structures that can be seen, do you agree?

A That is correct.

Q And that tower tells you that there are probably utility lines coming off from it in either direction?

A That is correct.

Q If you were to keep your helicopter above the top of this tower you would not hit any utility lines coming off that tower, would you?

A That is correct.

The following remark by the trial judge hearing post-trial motions is telling on whether there was evidence that the towers were "hidden" or "obscured":

> You know, to be perfectly frank with you, you know, you look at it from the common sense point of view, my initial impression of this case is gee whiz, *you got these two huge towers, come on, you got to know that there is something there,* you know, you got to be extremely careful when you fly in that area, that's the first thing that hits me.

(emphasis added). Here there is no evidence that the towers could not be seen if the pilot only looked. The majority appears to rely on the plaintiff's expert to create a rule that towers must "catch your attention" or "jump out at you" in order to provide sufficient notice of the wires. No such requirement exists in the regulations or prior case law.

Having found that there is testimony that the towers do not "catch your attention" or "jump out at you," the majority then focuses on whether the *wires* are clearly visible. The majority cites the testimony of the plaintiff's expert that the "lines were virtually impossible to see," and that "Arbeitman was *required* in his rescue to maneuver his helicopter in close

proximity to the power lines ..." (emphasis added). Unfortunately, Arbeitman was not *required* to be anywhere near these power lines to make a rescue. All versions of the events leading to the tragic wire strike begin with a boating accident *two miles south of the power lines,* almost directly across the river from where Arbeitman was sitting down for dinner. Arbietman takes off, flies about two miles north at an altitude of about 500 feet directly over the power lines in question. A boater sees that Arbeitman is headed in the wrong direction and flags him down. Arbeitman lowers his helicopter to an altitude of about 50 feet above the boat. The boater points him south. Arbeitman is then about 600 feet north of the power lines. He begins to head south, approaching the wires; but in that 600 feet he ascends only 50 feet and strikes the wires approximately 400 feet from the Illinois towers. Because these towers provide ample notice of the wires between them, I do not believe the power lines here create an unreasonable risk of harm to normally operating aircraft.

Finally, I disagree with the majority's claim that failure to impose a duty here would allow power companies one "free" collision. The case law in other states demonstrates that notice of an unreasonable risk of harm can arise without a prior strike. *See Brittain,* 486 P.2d at 177 ("the wire and the poles readily blended with the countryside which made them difficult to see from the air"); *Shute,* 899 F.2d at 1003 (configuration of the five different poles made it "foreseeable that a pilot would be 'fooled' by the wire-pole configuration and strike the power lines"); *Bailey v. Pennsylvania Electric Co.,* 409 Pa.Super. 374, 598 A.2d 41, 46 (1991) (utility *poles* were unpainted).

Here, plaintiffs failed to adduce evidence sufficient to prove that the power lines were unreasonably dangerous. The trial court should have granted the Motion for Judgment notwithstanding the verdict because the defendant had no duty to place marker balls on the wires in question. I believe the question of duty is dispositive. I would reverse.